EQUITABLE LOAN & SECURITY CO. *et al. v.* WARING *et al.*

1. The power of the courts to declare a contract void for being in contravention of a sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.

2. The authority of the lawmaking power to interfere with the private right of contract has its limits, and the courts should be extremely cautious in exercising the power to supervise private contracts which the lawmaking power has not declared unlawful.

3. The courts are not authorized to declare a contract void merely because it may be unwise or even foolish. Folly is not in all cases fraud.

4. The people of this State, as parens patriæ, have the power, through the courts, to protect persons of unsound mind, or under other disability, from the harmful effects of unwise or foolish contracts; but the power does not extend to such contracts when made by persons of full age, of sound mind, and laboring under no disability.

5. The possibility or probability of performance of many contracts known to the commercial world is dependent upon so many contingencies that it is only in an extreme case that a given contract can be said, as matter of law, to be so incapable of performance as to evidence a purpose to defraud.

6. The courts will always relieve an innocent party from the obligation of a contract which is the result of a fraud; but all contracts which are unreasonable, unwise, or even foolish, are not necessarily fraudulent.

7. The success of many legitimate business schemes, especially those relating to the handling and improving of sums of money, depends largely upon the honesty, wisdom, and business sagacity of those in charge of the scheme; and one who goes into such schemes takes the risks that are always incident to entrusting another with funds for improvement or profit.

8. While forfeitures are not unlawful, the law does not favor them, and all ambiguities in a contract are to be resolved against their existence; but where a contract in unmistakable terms provides for a forfeiture and is otherwise free from legal infirmity, neither a court of law nor a court of equity will relieve against the forfeiture.

9. Joint tenancy, with its incident of survivorship, as it existed at common law, is abolished. While survivorship is not favored by the law of this State, and will never arise by operation of law, it is not prohibited; and when a contract provides for it in express terms, or by necessary implication, the law will allow the contract to be enforced.

10. An investment association which applies the principle of survivorship to the investments by subscribers, the survivorship depending upon default of the members, instead of death, is not prohibited by law.

11. The mere fact that an enterprise depends for its success, to some extent, on forfeitures and lapses, is not alone sufficient to render the scheme unlawful.

12. It would seem that in order to render a scheme unlawful, contrary to public policy, and fraudulent, because it is dependent for success on forfeitures or lapses, it must appear that it is not only largely so dependent, but that it is beyond the range of all reasonable probability that the number of forfeitures or lapses necessary to effectuate the scheme will occur in the time required.

13. An enterprise dependent for success upon forfeitures or lapses, even many forfeitures or lapses, is not, for this reason alone, inherently fraudulent.

14. In order to constitute a lottery, three ingredients are essentially necessary, — consideration, prize, and chance.

15. When a number of persons are entitled, in any event, to a given amount, though it may not be the same amount, and all can not be paid at one time, the determination by lot of what portion of that number shall be paid at different times would not give the transaction the characteristics of a lottery. It is when the amount to be paid, or the value of the article to be delivered, is itself determined, either in whole or in part, by chance, that the elements of a lottery are present.

16. It is not to be presumed that people intend to violate the law, and the language of their undertakings must, if possible, be so construed as to make the obligation one which the law would recognize as valid. All ambiguities are to be resolved in favor of legality and against illegality. The contract is to be held illegal only when it will admit of no other construction.

17. While the construction placed upon a contract by one of the parties only is not controlling, still where a contract is capable of being construed either as legal or illegal, and either party, and especially the party upon whom the main obligation rests, has uniformly placed that construction upon the contract which would render it legal, this fact may be properly considered in determining the validity of the contract.

18. A corporation had authority under its charter to deal in stocks, bonds, etc., to negotiate loans, to loan money, to purchase, improve, and sell property, both real and personal, to guarantee the payment of obligations, and to issue investment certificates to be paid for by the investor in monthly installments. A large number of these certificates were issued. The provisions of each certificate were, in substance, as follows: An obligation to pay the holder $500 at the end of 14 years, in consideration of the payment by him of $4 as a membership or initiation fee and installments of $1.25 each month until the end of that period. The $4 was given as compensation to the agent procuring the contract, and 25 cents of each monthly installment went to pay expenses of the, company. Fifty per cent. of each monthly installment and all fines made a redemption fund; thirty per cent. a reserve fund. The holder was required to surrender the certificate whenever called, upon the payment of its redemption value, which was declared to be the full amount paid in, with interest at eight per cent. per annum and its "proportionate share of all dividends or accumulations from fines, lapses, and interest earned in excess of eight per cent. per annum." Certificates were to be called for redemption in the order indicated by a multiple table, based on the figure 3, which appeared on the back of each certificate. The redemption fund was to be used to pay off certificates called before maturity, to pay certificates at maturity, to pay estates of deceased certificate-holders, who were not over fifty years of age at the date of the certificate, the amounts paid thereon, with interest at eight per cent. and its proportionate share of profits earned in excess of eight per cent. per annum. The reserve fund was to be used and held for the protection of all live outstanding certificates. The failure to pay an installment subjected the holder to a fine of fifty cents each month. If any installment or fine remained unpaid for six months, all payments were forfeited to the company, provided that the payment of eighty-four installments would entitle the holder to a paid-up certificate bearing four per cent. interest. Legal

representatives of certificate-holders who were more than fifty years of age
at the date of the certificate were permitted to take a paid-up certificate of
the character above indicated, or to continue the payment of installments.
The entire assets of the company were to be liable for the payment of the
certificates.    The funds of the company could be loaned to certificate-holders
upon terms to be fixed by the directors.    No part of the reserve or redemp-
tion funds could ever be loaned to an officer or director.    No officer or di-
rector or any member of their families could be a certificate-holder.    It was
further provided in the certificate, "that no statement made by any one, ex-
cept as herein set forth, shall be binding on this company."    At the time the
certificates were offered for sale the objects, purposes, aims, and expectations
of the company were set forth in literature which was circulated by the com-
pany, and the statements therein were authorized by the company.    Held :
(a) That, properly construed, the certificate does not authorize the redemp-
tion of any certificate of a living person until it has earned at least eight per
cent. interest on the amounts paid in.    (b) That the scheme of the company
is not a lottery.    The fact that the certificates to be called for redemption
are determined by reference to a table of numbers, which, instead of being in
numerical order, has an arbitrary arrangement based on multiples of the fig-
ure 3, thus making it possible in some cases for certificates to be redeemed
before others of older date, does not give the scheme the characteristics of a
lottery, or one in the nature of a lottery.    (c) That it can not be said, as
matter of law, that the contract is incapable of performance by legitimate
methods, or that its performance is so largely dependent upon forfeitures or
lapses as to be fraudulent or contrary to public policy.    (d) That if any
statement in the literature of the company is at variance with what is con-
tained in the certificate, what is stated in the certificate must control until it
is reformed, or the contract therein contained is rescinded.

19. If the scheme described in the certificate above referred to was a lottery, or
in the nature thereof, or was so impossible of performance as to be fraudulent
or opposed to public policy, as was contended by the defendants in error, the
question as to whether a court of equity would, at the instance of those who
knowingly went into the scheme, administer the assets for their benefit, is not
now decided.

LAMAR, J. (with whom concurs SIMMONS, C. J.), dissenting.    The company is-
sued certificates (" Class A ") by which it promised to pay the holder $505.54
on condition that he should pay $1.25 monthly for 130 months, he agreeing to
surrender his certificate for redemption at a value fixed by a sliding scale, by
which, if redeemed one month after date, $15 was to be received, if two months
$18, and so on, the value increasing $3 with each installment paid.    Certifi-
cates to be redeemed were not selected in numerical order, but according to
a table using multiples of "three," under the operation of which younger
certificates could be called in before those of older date.    A cash payment of
$4, besides 25 cents per month for 130 months, was to be applied to expense
account.    Certificates not matured by the multiple table were, at the end of
130 months, to receive $505.54 for $166.50 paid in.    On failure to pay any
monthly installment a fine of 50 cents was imposed, and if not paid by the
succeeding month the certificate *lapsed*, and the holder *forfeited* all payments
and fines.    The United States postal authorities held this to be a *lottery*, and
the mails were closed against the company.    Retaining the scheme of lapses,
and the device of a multiple table to determine what certificates should be

redeemed, the company thereupon issued another form of certificate (" Class B ") substantially like the foregoing, except that it promised to pay $500 instead of $504 ; the number of installments was raised to 168 ; certificates were to be redeemed out of the profits on payment to the holder of the total amount which he had paid in, with eight per cent. interest thereon, *together with* his proportion of all fines and lapses.     Holders of certificates not called in under the device of the multiple table during 168 months would pay in $214, of which $46 was deducted for expenses, leaving $168 to be invested, and for this $214 the company absolutely promised to return $500, necessitating that it should earn twenty-eight per cent. profit per annum and pay the holder one hundred and thirty-three per cent., or nineteen per cent. per annum average interest. The company issued a half million dollars of these certificates, " Class B." It had a capital stock of only $2,500, and *no other property except that paid in by the certificate-holders, and the funds or property in which the certificate-holders' money was invested.     Held:*

1. " Class A" certificates constituted a lottery, and   Class B " was not essentially different therefrom, being in the nature of a lottery scheme, prohibited by the act of 1877 (Acts 1877, p. 112), as amended by the act of 1881 (Acts 1880–81, p. 62).

2. A court of equity should afford relief to a litigant expressly asking aid against such a contract, more readily than the postal authorities would volunteer to act on behalf of the public, which was not actively seeking protection.

3. In a number of instances where substantially similar schemes have been under review the courts have held the same to be illegal, contrary to public policy, and void.   Among many others see Horner *v.* U. S., 147 U. S. 460 ; State *v.* Interstate Investment Co., 52 L. R. A. 530 (where the effect of the table of multiples was involved)'; Peltz *v.* Supreme Financial Union, 19 Atl. 668 (2) ; State *v.* New Orleans Debenture Redemption Co., 26 So. 586.   The case of Union Investment Association *v.* Lutz, 50 Ill. App. 176, contra, is not a decision by a court of final resort.

4. Such holding is not solely in the interest of the certificate-holder who desires to discontinue the illegal scheme, but also in pursuance of a sound public policy and to prevent similar schemes from being launched.

5. To have selected certificates for cancellation by the usual methods of lot would have involved the element of chance ; to have selected them in numerical order would not have involved the element of chance ; to select them by the device of the multiple table making older certificates mature after younger, and where even this order was interfered with by lapses, was essentially a selection by lot, and was within the prohibition of the act of 1877.   State *v.* Interstate Savings Investment Co. (Ohio), 52 L. R. A. 530.

6. The scheme here involved chance on chance, by which an early redemption was a return of the amount paid in, with about ten per cent. interest, and amounted to a small prize if, later on, the scheme failed for want of lapses. To have the certificate redeemed at the end of the 168 months secured principal and one hundred and thirty-three per cent. profit, and was the greater prize, if the number of lapses proved sufficient to enable the plan to work out to the end of 168 months.

7. In determining whether the scheme is possible without undue lapses, the courts must exclude from the calculation windfalls, extraordinary and improbable rises in value of investments, and consider the risks of business, current rates of interest, and the fact that if such a scheme, without aid from undue lapses,

were regarded as possible by men of ordinary business prudence, the enormous profits promised would attract millions of capital from the more useful channels of trade and commerce.

8. The evidence discloses that out of $240,000, total profits earned, forty-nine per cent. of such profits, or $119,000, was derived from lapses, and that but for such lapses the company could not have redeemed the certificates already called in, and on which about ten per cent. interest was paid.

9. There is an absolute promise to pay $500 for every $214 paid in on certificates which mature at the end of 168 months. This involves the necessity of the company earning enough on each $168 to pay back the $46 appropriated for expenses, together with one hundred and thirty-three per cent. on $168, equal to an average annual interest of twenty-eight per cent. on the $168 invested, and a dividend of nineteen per cent. per annum to the certificate-holder.

10. A provision for incidental lapses does not render a scheme illegal. In legal and valid insurance contracts the element of a lapse is incidental, and the policy-holder has at all events received value in actual protection by insurance during the premium term. In strict tontines the lapses are not necessary to the success of the scheme, for all can remain in to the end of the period and get their share of the fund, whatever it may prove to be.

11. Equity abhors lapses, and will relieve against forfeitures (*S. C. R. Co.* v. *Augusta Co.*, 107 *Ga.* 182). A scheme largely depending on lapses for its success is illegal and contrary to public policy, for the reason that the lapses do not represent *earnings* of the company so much as *losses* of those unfortunates who, having started, are unable to hold out to the date of maturity. Equity is unwilling that others should reap that which they did not sow.

12. The guarantee to pay much for little appeals to that cupidity, and desire to "get rich quick," which makes the scheme contrary to public policy, and calls for action by a court of equity to protect those who, tempted by the guarantee of $500 for $214 paid in, are blind to the fact that they may be among the lapsed. Equity will act all the more quickly because those who are financially the weakest are most likely to lapse, to the benefit of the stronger who can continue to pay until the end of the term.

13. The right to make contracts is not unlimited. Civil Code, § 3668. The same public policy which forbids lotteries and futures, and which protects the necessitous from usurious contracts, will in like manner protect those who have been induced by the promise of usurious profits to go into a scheme depending for its performance on lapses, in which many must lose in order that few may gain.

14. The maxim, in pari delicto, etc., or that courts will not ordinarily interfere where parties to an illegal contract are equally guilty, does not apply here, because the parties are not on a *parity.*

(*a*) Nor does it apply where the contract is executory and in course of performance, as here.

(*b*) Nor does it apply, for the further reason that the defendant company really has no interest in the appropriation to be made of the fund by the court. It has been paid $4, together with 25 cents monthly, for investing a fund. It is in effect the agent of the certificate-holder, and the money in its hands is a trust fund, the real owners being the subscribers. Any holder, on proof of the insolvency of the agent or the impossibility of the ultimate performance of the scheme without undue lapses, is entitled to have the illegal scheme dis-

continued and the trust property placed in the hands of a receiver for distribution among the true owners.

15. If the scheme continues in operation, each certificate-holder must still pay, in order to avoid a lapse with the forfeiture of all that he has contributed. Equity will not force him to continue the illegal payments, nor to run the risk of a forfeiture by his withdrawal. Before the contract is finally executed, it allows a locus penitentiœ to those who desire to have the scheme discontinued ; and in aid of those seeking the discontinuance of the scheme the court will administer the trust fund for the benefit of the true owners. McLaughlin *v.* National Investment Co., 64 Fed. 908.

Argued February 20, — Decided April 8, 1903. Rehearing denied May 8, 1903.

Injunction and receiver. Before Judge Lumpkin. Fulton superior court. January 5, 1903.

Opinion of Judge Lumpkin: On January 30, 1894, the Equitable Loan & Security Company was incorporated; its capital stock being twenty-five hundred dollars. It began issuing what were called investment certificates, the certificates first issued being designated as Class A. Before the end of that year the Post-office Department refused the company the use of the United States mails, holding that the certificates issued by it and the business conducted by it constituted a lottery scheme. After this the company began issuing another set of certificates which it called Class B, [setting forth a form thereof — see opinion of the Supreme Court, infra]. On March 26, 1896, it obtained an amendment to its charter, conferring power, among other things, " to purchase, improve, lease, sell, dispose of, or use in any way it may see fit property of any description, whether real or personal." In March, 1897, McMillan and others filed their equitable petition, seeking to have a receiver appointed, alleging, among other things, that the contracts were illegal and impossible of performance; that the agents of the company, who procured them to purchase these certificates, made fraudulent representations to them; and that it was insolvent. On the preliminary hearing, the affidavits being conflicting, and the presiding judge not having before him such full light on all the questions involved in the case as he preferred to have before making a final adjudication, he permitted the company to give bond in lieu of appointing a receiver ad interim. The case was carried to the Supreme Court, where this ruling was affirmed as a proper use of discretion, as the case then stood. 102 *Ga.* 575. In 1898 it was referred to an auditor to report on all questions of law and fact, together with the evidence on which he based his findings. On

December 16, 1899, the auditor filed his report.　To this exceptions were filed by McMillan and others, and they came on for a hearing in 1900.　Before any decision was reached the plaintiffs withdrew and dismissed their exceptions, thus leaving nothing before the court to decide.

Under the law of this State (Civil Code, § 4601), there being no longer any exceptions to the auditor's report, the court could do nothing but frame a decree based on it, which he accordingly did. Plaintiffs on the present hearing introduced evidence seeking to show, and contended, that some sort of agreement or settlement was arrived at between the plaintiffs in that case and the company, and that the withdrawal of the exceptions resulted therefrom.　But with this the court had nothing to do.　It will be seen that what was apparently a victory for the company was in fact a pro forma decree resulting necessarily when the exceptions were withdrawn and nothing left for the court to decide.　The court has in fact never passed upon any of the questions here presented, further than is involved in the fact that in the former case he preferred to have a full and complete investigation before passing final judgment, and therefore permitted a bond or bonds to be given in lieu of appointing a receiver pending the cause.　It seems from the evidence in the present case that there has been a misunderstanding of this fact.　The report of the auditor was favorable to the company, and this was printed and scattered.　On this hearing counsel for some of the certificate-holders, who object to the receivership, has urged in argument that he and his clients thought that the court had fully approved of and decided in favor of the company's contentions in the former case; and this has been brought forward as an argument why the court should now decline to appoint a receiver.　On the other hand, counsel for the company urge that if the court is in doubt as to the contentions of the parties in the present case, he should refuse the receivership as a matter of discretion; so that the court is put between two horns of an argumentative dilemma, the one being the contention that he should not appoint a receiver, as a matter of discretion, ad interim; and the other being that, because he did not do so before, certificate-holders took it as a complete victory for the company.　It may be stated, however, that the evidence in the present case is different from what it was then, and that the status is different.

In September, 1902, Waring and others (being holders of certificates of the company on which, together with those of parties who have become plaintiffs by order, had been paid into its treasury some thirty-five or forty thousand dollars) filed the present equitable petition, seeking, among other things, the appointment of a receiver, to have the scheme of the company declared illegal, to have judgment for what they might justly be entitled to recover, and to have proper disposition of the fund.     This petition stated that it was filed "on behalf of the petitioners and of all other holders of certificates of the company."     The defendant resists the appointment of a receiver, and a number of certificate-holders, representing quite a considerable amount, have joined in the objection.     The hearing on the application for the appointment of a receiver occupied fifteen days; hundreds of affidavits were introduced; the books and records of the company were brought into court; experts on each side have had access to them, and have given testimony concerning them.     The managing officers of the company were summoned before a commissioner and their evidence taken with full and thorough cross-examination, and argument of counsel on each side has been heard.     There is no need for any further auditor to report to the court the facts of the case, in order to arrive at a conclusion.     If he is not in possession of the facts after this hearing, it is much to be feared he never will be; and no hearing could be of further service to him, so far as deciding the questions now raised is concerned.     He feels that he ought to decide the principal legal questions made.     Many questions have been raised, and many grounds of attack made upon the company.     In the decision which the court will make he will endeavor to base his judgment upon the controlling questions of law, and, as far as possible, to avoid relying on matters of discretionary decision.     If it is desired to except to his decree, it can thus be done, and a decision of the Supreme Court reached which will not be a mere affirmance or reversal of a discretionary judgment, but will pass upon the correctness of the rulings of this court in regard to the law.     Several of the points raised by the plaintiffs will be dealt with briefly, before going into the main controlling questions in the case.

It was contended by the plaintiffs that the charter of the company as originally granted contained no power to invest in real estate, that the amendment which was granted in 1896 was not lawfully

accepted by the stockholders of the company, and that such investments were injurious to the holders of certificates, and were illegal. Generally the question whether an amendment to a charter of a corporation is legally accepted by the corporation or its stockholders is one in which the stockholders and the company alone are interested.    If the stockholders are satisfied with and acquiesce in the manner of acceptance, certificate-holders can not set up for them that some one or more of them was absent, or that the manner of acceptance might have been objected to by them, unless there is something in the contract between the company and the certificate-holders, or in the relations between the two, which authorizes the latter to raise the question.    There is not, in this case.

It is contended by the plaintiffs that the officers of the company have been guilty of malfeasance and breach of trust in various ways. There have, no doubt, been some errors and irregularities in the affairs of the company, and in the keeping of its books.    For instance, it would have been better for the secretary not to have sold notes belonging to him as an individual to the company of which he was an officer.    Human nature is very weak, and it is not well for a man to be on both sides of a trade.    But some errors are apt to occur in a company doing a considerable business, and the evidence does not disclose any such mismanagement or waste on the part of its officers as would require the appointment of a receiver at this time on that ground.    Indeed it may be stated, to the credit of the principal officers, that they have given opportunity for a thorough examination of their books and accounts, and have promptly furnished to the court, in the progress of the hearing, information desired.    Upon the whole, the court is of opinion that the evidence does not indicate any personal dishonesty or peculations on their part in dealing with the assets.

The plaintiffs alleged and sought to prove that the agents of the company soliciting persons to purchase these certificates were guilty of making false and fraudulent representations, and that purchasers were misled thereby and acted thereon.    There was some proof indicating that an agent or agents of the company had at times given too free rein to imagination, and had been somewhat economical of the truth.    Indeed no evidence from these agents was introduced in denial of such contentions on the part of plaintiffs.    If individual holders of certificates were induced to purchase them by fraud-

ulent representations of the selling agents, while it might become ground for a rescission of the contract so far as they were concerned, it would not necessitate the appointment of a receiver for the entire assets of the company, unless it were shown that a receiver was necessary for the protection of the rights of such persons. There is some question, too, as to whether some of the persons asserting that they were deceived are not prevented from setting up such a claim, by agreeing with the company that it should not be bound by the representations of such agents. If, therefore, the scheme of the company is legal and its contracts valid, if any deception was practiced upon certain certificate-holders, it would not require the appointment of a receiver.

It is contended that the company is insolvent, and that it can not perform its agreements. In the ordinary sense of the term, solvency or insolvency is determined by a comparison of assets and liabilities. In certain classes of corporations, such as building and loan associations, a somewhat different meaning has been given to the term; or perhaps the word has been used for want of a better one. See Towle *v.* American Building Society, 61 Fed. 447. It is urged here that, inasmuch as certificates have not yet matured, the company can not be held insolvent. As it is the intention of the court to rest his decision upon other grounds, he does not deem it necessary to enter into a discussion of the solvency or insolvency of this company as a separate question. In so far as the state of its assets is material to a decision of the legal questions decided, reference will be made to it hereafter. So also, so far as necessary, consideration will be given later in this decision to the question of the possibility of performance of the contracts.

This brings us to one of the great controlling questions in the case. Is this scheme illegal or contrary to public policy, as being a lottery, or in the nature of a lottery, or involving a similar scheme or device?

The Penal Code of this State contains the following provisions:

"§ 406. If any person, either by himself or his agent, shall sell or offer for sale, or procure for, or furnish to any person any ticket, number, combination, or chance, or anything representing a chance in any lottery, gift enterprise, or other similar scheme or device, whether such lottery, gift enterprise, or scheme shall be operated in this State or not, he shall be guilty of a misdemeanor.

"§ 407. No person, by himself or another, shall keep, maintain, employ, or carry on any lottery in this State, or other scheme or device for the hazarding of any money or valuable thing."

It will thus be seen that the law of Georgia denounces as illegal not only a lottery, strictly so called, but also any gift enterprise, "or other similar scheme or device," "or other scheme or device for the hazarding of any money or valuable thing." It will not be necessary to set forth at length the definitions of a lottery given by various dictionaries, or to discuss the verbal differences in them. Perhaps as good a general definition as can be found is that given by Mr. Bishop (Stat. Cr. § 952), as follows: "Any scheme whereby one, on paying money or other valuable thing to another, becomes entitled to receive from him such a return in value, or nothing, as some formula of chance may determine."

Shrewd differentiation may escape from the definition; but a general statute, like ours, is aimed to reach the substance of the scheme, regardless of any mere variation in form, and to leave no loophole of escape by mere quibbling with words. U. S. v. Wallis, 58 Fed. Rep. 942. A consideration of various definitions of the word "lottery," and of numerous decisions, indicates that three elements enter into such a scheme; and that if they exist, it is a lottery, or "similar scheme or device," and condemned by laws against lottery, no matter what may be the particular form of words or cloak of phrases in which it may conceal itself. These elements are: (1) A consideration. (2) Chance. (3) A prize, or some advantage or inequality in amount or value which is in the nature of a prize.

(1) The consideration need not be great. It may be in money or other things of value. Sometimes the attracting of custom to one's business, or other benefit to the person conducting the scheme, is held to be sufficient, although no money is paid directly for the ticket, lot, or chance, but it purports to be given. In the present case money is directly paid by the purchasers of certificates; and there is no controversy as to the existence of the element of consideration.

(2) Does chance enter into the scheme? What is chance? It has been defined to be "the unknown or undefined cause of events that to us are uncertain or not subject to calculation; luck; fortune; . . an event resulting from an assumed fortuitous agency; an accident," etc. (Standard Dictionary). The Century Dictionary,

among other definitions, gives this: "Fortuity; especially the absence of a cause necessitating an event, or the absence of any known reason why an event should turn out one way rather than another, spoken of as if it were a real agency." Worcester defines it to be "absence of an assignable cause; accident; fortuity; fortune." In an opinion filed by Hon. Harrison G. Barrett, acting assistant attorney-general of the United States for the Post-office Department, on December 5, 1900, he quotes the following: "Chance, in its original meaning, may be defined as that which determines the course of events in the absence of law, ordinary causation, or providence." Of course in a certain absolute sense there is no chance. Everything in the universe acts according to some law. The card drawn at random from the pack, the fall of the dice, the ticket drawn from the lottery wheel, all obey some law. To Omniscience the word chance has no meaning. But from the standpoint of humanity, these and many other things are results of chance or accident. An event which is the result of calculation, design, or the operation of known laws, does not occur by chance. An event which happens as a result of an unknown or undefined cause that to man is uncertain, or not subject to calculation, is the result of chance.

Is there or not chance involved in this scheme? The company issues certificates which are numbered in regular order as they are issued. The purchaser has no option as to the number placed on his certificate. He can not select any particular number. He can not foresee or calculate what number the certificate will bear. He sends in his application. The officer or agent of the company can not select a number for him. Neither can he foresee or calculate in advance what number will fall to any particular applicant. The certificates are numbered just as the applications happen to reach the main office. Some are sent by mail; some have been sent in the past by the soliciting agents by telegraph. If several applications arrive by the same mail, they are numbered in the order of their dates. If several bear the same date, there is no mode of selection, except the accident of which one the official picks up first. Suppose one man should send an application by mail from Savannah, or any distant city, and the application of another should be sent by telegraph on the same day. The latter would get the earlier number. If both were sent by mail, and both reached the main office at the same time, it would be the merest accident which would

receive the earlier number.　If both were sent by telegraph, and both reached the main office at the same time, it would be the merest accident which would receive the earlier number.　If one were delivered by a later mail, it would get a higher number.　If one mailed an application from a neighboring town, say Decatur, and another on the same day mailed an application from Savannah, at a greater distance, the former arriving first would be first numbered. Thus it will be seen that the number which a purchaser gets is not the result of choice or selection of it, either by him or by the agent of the company, but depends on the accident of the time of arrival of his application, the number of applications which happen to arrive on a certain day, or the accident of the picking up of one paper instead of another by the numbering official, if several of the same date arrive at the same time.　So that the number which a purchaser obtains is purely the result of chance, so far as he and the company are concerned.

What effect has this numbering, obtained by chance, on the selection of certificates to be redeemed, if the company has a redemption ?　If certificates are called for payment, those to be paid are to be selected, not by choice, but skipping about according to the use of a table containing a set of numbers, which are called numerals, and another set of numbers called multiples.　Thus certificate number 1 is first to be paid, then number 3, then 9, then 2, then 6, then 18, then 27, then 4, then 12, then 36, then 5, then 15, then 45, then 54, and so on indefinitely, the distance between numbers to be paid increasing, so that after 100 comes 300, and then 900. When the numbers reach the thousands, they must be quite wide apart.　There are now about 6,000 certificates outstanding.　It will thus be apparent that whenever the company calls a number of certificates for redemption, whose certificates will be redeemed depends on chance.　The holder of a certificate is not allowed to demand its redemption.　The company is not allowed to redeem, by choice or by agreement with the holder, any particular certificate. But its redemption is made to depend on the chance of its number corresponding with a number in the multiple table.

But it is said the company is not compelled under the contract to redeem before the end of one hundred and sixty-eight months, and that earlier redemption is a privilege, not a requirement.　This feature of the contract will be referred to again later.　For the

present, it is enough to say that the certificate provides that it shall be surrendered if called for redemption; that the avowed policy and governing principles of the company, as set forth in the pamphlets sent out by it, are "security, profit earnings, and speedy returns to investors;" that it has called in and redeemed numerous certificates in the past (several hundred of Class B at various times); and that the determination of the numbers to be redeemed is and was fixed by chance, as already shown.      Indeed, it is the boast of the company that the selection is by chance (though that word is not used), and not by design or choice; for on the face of the certificate occurs this statement:      "That, in order to prevent favoritism or partiality being shown by the company, certificates paid before maturity shall be paid by numbers, and only according to the multiple table which is printed on the back hereof."      In a letter from its president to W. M. Bent, dated May 30th, 1902, he says:      "We pay only as provided in the table on the back of each certificate, and can not ourselves determine when any certificate will be paid."      Thus the company holds out as its plan of action the use of chance, and actually uses it.

Another element of chance involved is from lapses or forfeitures by certificate-holders who fail to keep up their payments of installments.      This further introduces chance, both as to the amount on hand which may be divided, and also as to the numbers to be redeemed; for if there is a lapse, and the lapsed number should otherwise be subject to redemption, it would drop out, and some other number would become subject, not from any selection or choice, but from the accident of the lapsing of one or more numbers, over which the holder of the redeemed certificate had no control.      The element of new business would also add to the redemption fund which can be used to redeem other numbers, thus making the payment to them greater, and also increase the chance numbers in the redemption possibilities according to the table.      If this scheme does not involve chance, it is hard to conceive one which does.

It is urged that the element of chance alone, unless connected with the element of prize, does not constitute a lottery, or similar scheme.      This may be treated as correct, but the question of combination of chance and prize in this scheme will be spoken of later. The purpose now is to show that if the element of prize does exist, the element of chance also coexists with it, thus making it a lottery

scheme. In MacDonald v. U. S., 63 Fed. 426, it is said that " where the value of bonds in an investment company depends on their number, and the numbering is done by the secretary according to the order in which the applications happen to reach him, the result of a purchase of such bonds is so dependent on chance as to render their sale a lottery." In U. S. v. Fulkerson, 74 Fed. 619, it is said (p. 628): " The element of chance is especially and clearly discernible in the fact that the numbers of the coupons which any particular applicant receives depends upon the order in which his application goes into the company, and that the determination of what coupons shall be paid is made to depend upon a device of numbers whose operations are such that it is utterly impossible for any one to know the result until the same has been accomplished." So it is here.

(3) Does this scheme include an element of prize? The word "prize" has been defined by Webster as " that which is obtained against the competition of others ; anything carried off as the result or award of a contest; the thing striven for; and hence anything offered to be competed for, or as the inducement to or reward of effort; that which is won in a lottery." One definition given by the Century Dictionary is " that which is won in a lottery, or in any similar way." Among the definitions of the word given in the Standard Dictionary are " anything to be striven for ; also anything offered as an inducement to participate in a scheme of chance." As used in connection with anti-lottery laws, the word " prize " comprehends anything of value gained (or correspondingly lost) by the operation of chance, or any inequality in amount or value in a scheme of payment of money or other thing of value as a result of the use of chance. The gain need not be large to constitute a prize. If there are a number of purchasers of tickets, bonds, certificates, or whatever the thing sold may be called, who enter on equal terms, but in the payment by the company or manager the scheme includes the making of an inequality in amounts by the employment of chance so that one gets more than another similarly situated, it is a lottery. The inequality may not be great, nor in favor of the person selected by chance. It may be against him. He need not lose all, or gain all. Partial gain (or loss in the hope of gain) is sufficient to constitute a prize. That a scheme wherein inequality in payment or distribution is to result from chance is a lottery, see Dunn v. People, 40 Ill. 465 (3). The fact that each gets something,

or even gets the value of what he pays, will not save the scheme or make it legal. In *Meyer* v. *State*, 112 *Ga.* 20, it is said : " A merchant who gives to a designated class of customers an opportunity to secure by lot or chance any article of value additional to that for which such customers have paid violates the provisions of section 407 of the Penal Code, which declares that no person ' shall keep, maintain, employ, or carry on any lottery in this State, or other scheme or device for the hazarding of any money or valuable thing.' " A number of cases are reviewed by Mr. Justice Cobb in the opinion. In U. S. *v.* Wallis, 58 Fed. Rep. 942, a similar ruling is made, and it is also said that " the word ' lottery ' embraces the elements of procuring through lot or chance, by the investment of money or something of value, some greater amount of money or thing of value."

In Ballock *v.* State, 73 Md. 1, 8 L. R. A. 671, 25 Am. St. R. 559, it is held that any device whereby money or any other thing is to be paid or delivered on the happening of any event or contingency in the nature of a lottery is illegal under the laws relating to lotteries and lottery tickets; and that the fact that there are no blanks to be drawn, but all get something, and the scheme provides for the ultimate return of the entire investment, with interest, will not legalize it, if the time for such return to certain holders of bonds depends on chance, and the inducement for investment is the possibility of getting a bonus, which is to be determined in the same manner. See also U. S. *v.* Politzer, 59 Fed. Rep. 273, 277-8, 279, 280. In Horner *v.* U. S., 147 U. S. 449, 462, the same Austrian bonds which were involved in the Maryland case were considered. The Supreme Court of the United States rendered an interesting and learned decision, approvingly citing the decision of the Supreme Court of Maryland, and holding substantially the same doctrine. The following brief excerpts may be of interest : " It can not be said that this is not a species of gambling, and that it does not tend in any degree to promote a gambling spirit, and a love of making gain through the chance of dice, cards, wheel, or other method of settling a contingency. It certainly can not be said that it is not in ' the nature of a lottery,' and that it had no tendency to create a desire for other and more pernicious modes of gaming."

In Reg. *v.* Harris, 10 Cox's C. C. 352, it was held that a lottery in which tickets were drawn by subscribers of a shilling, which en-

titled them at all events to what purported to be of the value of a shilling, and also to the chance of a greater value than a shilling, was an illegal lottery within the statute. In Sykes v. Beadon, L. R. 11 Ch. Div. 170, 190, there were holders of certificates who subscribed money to be invested in funds which were to be divided amongst them by lot, and divided unequally; that is, those who got the benefit of the drawings got a bond bearing interest and a bonus, which gave them different advantages from the person whose certificates were not drawn; and it depended upon chance who got the greater or lesser advantage. The scheme was held to be a subscription by a number of persons to a fund for the purpose of dividing that fund among them by chance, and unequally; and Sir George Jessel, master of the rolls, characterized the scheme as a lottery. In State v. Interstate Savings Investment Co. (Ohio), 52 L. R. A. 530, it is held that "Contracts of investment security debentures or certificates which, by the device of a 'numeral apart,' may be called in and redeemed at any period before they would regularly accumulate a credit in the reserve fund equal to the stipulated endowment value, and otherwise giving unequal advantages to the certificate-holders, contain the elements of chance and prize constituting a lottery, and are unlawful." See also U. S. v. McDonald, 59 Fed. 563; same case on review by Court of Appeals, 63 Fed. 426 (supra); People v. Elliott (Mich.), 3 L. R. A. 403; U. S. v. Fulkerson, 74 Fed. 619; In re National Indemnity & Endowment Co. (Penn.), 21 Atl. 879; State v. New Orleans Debenture Co. (La.), 26 So. 586, 589; McLaughlin v. National Bond & Investment Co., 64 Fed. 908; Peltz v. Supreme Chamber (N. J.), 19 Atl. 668 (2), 671.

It is urged that the facts in the cases cited were not the same as in this case. It may be said in general terms that no two cases are precisely alike. But if the principle decided in the one applies in the other, it is sufficient as a precedent. The ingenuity with which schemes of chance are varied to avoid the statutes or add new and alluring features is little short of wonderful. As fast as statutes are passed, or decisions made, some skilful change is devised in the plan of operations, in the hope of getting just beyond the statutory prohibition; but so long as the inherent evil remains, it matters not how the special facts may be shifted, the scheme is still unlawful. In this company, Class A certificates having been declared by the postal authorities obnoxious to the lottery laws, and the mails closed

to them, a change was made; but the scheme of calling in certificates issued according to chance, and dependent on chance numbers for redemption, was left in Class B certificates; and it will presently be shown that the inequalities existing under these redemptions constituted prizes within the meaning of the lottery laws. A few illustrations of the exercise of the ingenuity which yet failed to avoid the law may not be uninteresting. Prize Candy Boxes: Halloman *v.* State, 2 Tex. App. 610, 28 Am. Rep. 439. Allowing purchasers of goods to a certain amount a guess at the number of beans in a globe, with an offer of a watch to the one making the nearest guess: Hudelson *v.* State, 94 Ind. 426, 48 Am. Rep. 171. Sale of clothes to a certain amount, payable in instalments, with drawings entitling some to goods without further payments, though each eventually should receive clothes of the value paid: 51 N. W. 618. Selling tea, some envelopes containing tickets entitling the holder to a handkerchief, chicken, etc., holder selecting his own envelope: State *v.* Boneil (La.), 10 L. R. A. 60. A "gift sale" of books: State *v.* Clark, 33 N. H. 329. "Prize Concerts:" Com. *v.* Flasker, 97 Mass. 583. And the list could be almost indefinitely extended. The word "lottery" must be construed with a view of remedying the mischief intended to be prevented, and to suppress all evasions for its continuance. State *v.* Kansas Mercantile Ass'n (Kas.), 11 L. R. A. 430, 431.

It is said that the contract in Class B certificates does not require the company to redeem, but provides only that the holder shall surrender the certificate "for payment and cancellation whenever the same shall be called, before maturity," and that this leaves the company or its managers to determine when certificates shall be called in. As already noticed, several hundred have actually been called in. The following are a few extracts from the pamphlets sent out by the company to obtain custom, construing the contract and declaring the purpose of the company: "Its governing principles are security, profit earning, and speedy return to the investor." "The company is now calling its Class B certificates for redemption, and the following numbers have been paid" [giving a list]. "The chief attraction and most prominent feature of our plan is to call and *pay off certificates* [printed in red ink] as rapidly as our business will permit, at their then value, which value shall always be the full amount of the first payment and all installments paid

on them, with 8 per cent. interest, and their proportionate share of all dividends or accumulations from fines, lapses (forfeitures), and interest earned in excess of 8 per cent. per annum. For the express purpose of thus *calling certificates for payment* [red ink] as early and as rapidly as possible a *redemption fund* [red ink] has been created to which is placed 50 per cent. (62 1-2 cents) of each installment paid and all fines." " *To Guarantee* [red ink] our certificate holders the largest profit and quickest possible returns," no officer or director familiar with the inside workings of the company is allowed to hold certificates. Again, "thus rendering possible an early payment of certificates at a handsome profit above the rate of interest agreed upon." " Redemption Fund. Fifty per cent. (62 1-2 cents) of each installment paid and all fines shall be placed to a redemption fund which can be used for paying off and retiring certificates before their maturity." " All certificates pay their holders their equitable ratio of profit, whether called for redemption the 12th, 24th, 36th, or any other month." " Insurance companies kill the man and pay the policy: The Equitable Loan & Security Company kills the certificate and pays the man, thereby insuring a speedy return to living members." " A thorough knowledge of our plan will also show that it is absolutely perfect in point of security, profit earning, equity, and a speedy return to the investor." These, and like statements, repeated again and again in various publications, show conclusively the announced policy and declared intention of the company; and the claim that the scheme was safe, feasible, and practicable.

The certificates themselves state that the installments of $1.25 per month on each, received from the holders, shall be divided into three parts, 50 per cent. going to a " redemption fund," 30 per cent. going to a " reserve fund, which shall be used and held for the protection of all live outstanding certificates; " and 20 per cent. to the expense fund. Now why name a fund the " redemption fund " unless it was intended to use it to redeem ? or at least to convey that idea ? The different things which it is stated in the 4th paragraph of the certificates that the redemption fund may be used to pay does not negative the idea that it is intended to be used TO PAY, not to hold for investment. If there is no difference between the " redemption fund " and the " reserve fund," why the division ? And why provide only as to the reserve fund that it shall be held ? In a let-

ter from the president of the company to W. M. Bent, dated May 29th, 1902, he says : " We redeem certificates each month."   Thus by the terms of the certificates themselves, by the declared policy and " governing principles " of the company as stated again and again in print, and to some extent by its actual practice, redemption and " speedy return to the investor " are integral parts of this scheme.   The fact that no specific time or plan for the operation of the chance redemption, or drawing, has been determined upon at the time the ticket, bond, certificate, or whatever the token may be called is sold, will not save the scheme, if it is otherwise tainted as a lottery scheme.   Thomas *v.* People, 59 Ill. 160.   Nor if the matter is dependent on the choice or selection of the managers.   State *v.* Shorts, 32 N. J. L. 398.

In the case of the State *v.* Interstate Co., 52 L. R. A., 530, supra, the certificates in " Series A " provided that the first six months' payments were to be passed to the credit of the reserve and expense fund ; and of subsequent payments 65 per cent. was placed to the redemption fund, 20 per cent. to the reserve fund, and 15 per cent. to the expense fund.   " Not less than 20 per cent. of the total amount contributed to the redemption fund is applied every month to redeem," etc.   " Regular redemptions.   The company reserves the right to call in and pay this certificate at any time previous to its maturity.   .   .   The directors reserve the right to modify this method of redemption at such a time and in such a manner as will, in their judgment, be to the best interests of certificate-holders." But it was held to be a lottery scheme, in spite of the use of this form of language.   Note also the permissive form of language used in the case of McLaughlin, 64 Fed. 908, supra; and that the certificate was " subject " to redemption by the company at any time before maturity, and that there was to be appropriated to the certificate " its proportionate share of the reserve fund."   In the New Orleans Debenture Co. case, 26 So. 586, the certificate was " subject to redemption."   Compare also the determination allowed in 40 Ill. 465 supra.   If mere permissive forms of words would change the character of a scheme from a lottery to no lottery, why could not any lottery openly operate an agency in every county of the State by merely having printed on the tickets that the directors " may " call in the tickets or have drawings when they think sound business principles will authorize, actually calling in and redeeming some by

a chance determination, and holding out as an inducement to buy-
ers that this was a governing principle of the company. It is not
the form of words used; it is the nature of the scheme which de-
termines its legality or illegality. Nor does the fact that the prizes
in some of the cases cited are large make any difference. A scheme,
if illegal as tainted with a lottery feature, would not become legal
by reducing the size of its prizes. If so, all lotteries with small
prizes, would be legal. It is the element of gain or inequality aris-
ing from the use of chance which condemns a scheme, not the size
of the prizes. To quote an expression from one of the sages of the
law, "The office of the judges is to make such a construction as
will suppress the mischief and advance the remedy, and to suppress
all evasions for the continuance of the mischief." Magdalen Col-
lege Case, 11 Co. 71 b. See also Thomas v. People, 59 Ill. 160.

Is there inequality in distribution resulting from chance ? The
secretary of the company has made an affidavit showing how he
claims amounts paid on certificates heretofore redeemed since April,
1901, were arrived at. For the present purpose, we may assume
his calculations to be correct. So doing, he says that each certifi-
cate which has been redeemed has received an amount equal to the
first payment of $4.00, plus the sum of the installments of $1.25
per month, with interest for the average time at the rate of 93-100
per cent. per annum. Or that, if the first payment of $4.00, and
the 25 cents per month which went to expenses, be not considered,
but only the $1.00 per month paid into the redemption and reserve
funds, on each certificate called in there has been paid to the holder
the $1.00 per month, with 15 56-100 per cent. per annum, com-
pounded quarterly ; and that the basis for this calculation was the
net assets appearing on the books of the company in April, 1901.
On the trial the company introduced in evidence the affidavit of an
expert accountant, showing what was called an "apportionment of
profits," that is, what any particular certificate would be valued at
on August 31, 1902, on the basis of the books as they then stood,
and therefore what the holder of such a certificate would be paid
if it were called for redemption. His affidavit shows that if a cer-
tificate were then or since called, there would be paid, by such cal-
culation, the $1.00 per month paid into the redemption and reserve
funds, with 14 per cent. interest compounded quarterly. So that
if these two affidavits be true and correct, those who have had cer-

tificates called in for redemption by the use of the chance device already explained, even including a redemption in August, received 15 56-100 per cent. on the monthly payment of $1.00, compounded quarterly; while certificates redeemed after August 31 would have received payment at the rate of 14 per cent., compounded quarterly, a difference of one and fifty-six one hundredths per cent. compounded quarterly; and the man who received this difference received it as a result of the mode of redeeming by chance. A small error in the entries on the books was afterward found, but as what would be taken off of one account would go to another and there was a small increase of both assets and liabilities, it made no material change in the calculation.

Seeing this trouble, no doubt, the secretary of the company stated in another affidavit, in substance, that the valuation of assets appearing on the books was not correct, but much too small; that, taking estimates of certain real estate dealers and others, and considering the assets at a low estimate, an "apportionment" will show that the present value of a certificate would be fixed by calculating interest on each monthly payment of one dollar into the reserve and redemption funds at the rate of eighteen and thirty-six one hundredths (18.36) per cent. compounded quarterly, or perhaps slightly more. Suppose this is true, what then? In the first place, the value of certificates heretofore redeemed since April, 1901, has been determined with reference to a book valuation of that time. The books on August 31, 1902, showed assets on the basis of which the expert employed by the company calculated. Now, it being evident that the book valuation shows that certificates already redeemed received more than is left for any of the certificates still unredeemed, the book valuation is to be rejected entirely, and a new estimate made, although the company had printed and sent out as true the statement of August 31, showing what it called its assets and liabilities. Very well. Suppose the new estimate, which the secretary says is low, be taken, what is the result? The certificates redeemed even down to and including August just before this suit have been paid on the basis of 15.56 per cent., on the $1.00 per month, compounded quarterly. Those still in, and which may now be redeemed, will get paid on the basis of 18.36 per cent., on the one dollar per month, compounded quarterly, a difference of 2.80 per cent., or nearly three per cent. on the one dollar per month,

compounded quarterly. If the calculation of the expert employed, and whose evidence was introduced by the company, is correct, certificates which were redeemed up to the filing of this petition obtained an advantage over those remaining unredeemed, by having their values fixed at a rate of interest one and one half per cent. higher, compounded quarterly. If the last calculation of the secretary be taken as true, those redeemed lost at the rate of nearly three per cent., compounded quarterly. It is a matter of indifference which is taken as true. Either one shows that those redeemed and those unredeemed are not equal. This inequality being brought about by the chance method of redemption already described makes a lottery feature. As the company seeks to show equality and repel the idea of prizes by using per cents., that form of expression is followed, so that it may appear, by mere comparison of the affidavits introduced by the defendant, that there is inequality, not alone in time of redemption, but also in amounts between the redeemed and the unredeemed. One very significant expression is used by the secretary in seeking to explain why the calculation of the expert showed a less valuation for certificates unredeemed. After speaking of a real estate purchase, etc., since the process of redeeming began, he says that "that period (i. e. April, 1901) was nearer to the time of the great number of lapses following the McMillan suit." In other words, what falls in by the chance of lapses is paid out, at least in part, by a chance table.

Another thing which will emphasize the risk of loss is this: As will be remembered, the first payment of $4.00 goes to the agent; 25 cents of each monthly installment is used for expenses, and only the $1.00 remains to earn and build up. It will readily be seen that it will require several years, even at the rates of interest estimated by defendant and its expert witness, before the dollar can earn back the primary four dollars and the twenty-five cents a month. To illustrate: The holder of a certificate on which the first monthly dues were paid in October, 1901, paid in $4.00 to enter, and $1.25 per month, aggregating to the end of August, 1902, $17.75. According to the calculation of the expert its value (or, what is more resonantly called, its apportionment of profits) on August 31, 1902, was $11.79. Therefore, if by the multiple table that number should be reached for redemption the owner would receive actually less than he had paid in by $5.96. Again, the holder of a certificate

on which the first monthly payment was made in May, 1899, paid the preliminary amount of $4.00 and forty installments of $1.25, making $54.00.   Its value is fixed at $51.06.   These are not isolated cases.   The same is true of a large number of certificates.   In fact, on certificates running back to January, 1899, the allotment is less than the amount actually paid in, regardless of interest.   Similar results appear from the secretary's calculation of values on April 1, 1901.   Suppose that by the multiple table the redemption number should fall on any one of these, is it not evident that the holder would get less than he paid in, regardless of interest, and suffer an actual loss ?   It is said that this has not happened ; and perhaps not.   But, under the multiple table, the numbers subject to redemption rapidly get wider apart.   Already, since redemption began in 1901, the skipping process has stretched from the beginning of the table to number 3141; and it is apparent that in the course of time, by continuation of this process, a number or numbers will be reached which, if redeemed, will not only pay the holder no profit but will cause him actual loss.   If the company honestly abides by its scheme, and continues to redeem according to the declarations quoted, it can not prevent the result.   It is no answer to this to say that the company may devise some way to meet it.   Such a suggestion met with no favor in 59 Ill. 160, and 33 N. H. 329, supra.

There is another thing which seems to run through all the calculations of the company.   If a certificate-holder fails to pay his installments for one or more months, they seem to ignore him as a person to whom payment may have to be made, treating him as not "in good standing."   In apportioning out the assets and determining the values for redemption they include the amounts paid by him as assets, but leave him entirely out as a possible claimant. At least this seems to be true ; and in one affidavit of the expert he made a correction on account of some persons in this condition, who in fact paid their fines and dues, and returned to " good standing."   By the terms of the certificates, a man does not lose all right, or his certificate lapse until after six months default.   He can pay up, with the fines imposed for delay.   So that to leave a number of such persons out of the calculation is to ignore quite an important factor.

It is practically admitted that the certificates belonging to Class

A are illegal. But it is contended that those in Class B are so different as to avoid the illegality. There are several points of difference, and the certificates belonging to Class A are more clearly and plainly illegal. But, in the opinion of this court, the illegality is preserved in the certificates of Class B. In Class A the maturity value was $505.54, maturing after one hundred and thirty installments of $1.25 had been paid. In Class B $500.00 is fixed as the maturity value after 168 months. As will appear more fully later on, neither can be accomplished by the legitimate investment of money, nor without the aid of large lapses. As to calls for redemption before maturity, each uses the form : "That the holder shall surrender for cancellation this certificate when the same shall be called, upon the payment to him of its then redemption value." In Class A certain amounts are named if the certificate should be called at certain times. In Class B it states that "redemption value" shall be the full amount of the first payment and all installments paid hereon, with interest on said amount at eight per cent. per annum and its proportionate share of all dividends or accumulations from fines, lapses, and interest earned in excess of eight per cent. per annum." One of these fixes the sum to be paid outright; the other fixes it by giving certain elements from which the minimum amount can be calculated, with the hope of more held out. It promises to pay certainly the amount fixed by the payments of the certificate-holder, with eight per cent. interest, regardless of the time of call, and regardless of whether eight per cent. had been earned or not. It is suggested that the added words "and its proportionate share," etc., above eight per cent., indicate that it was not subject to call until more than eight per cent. had been earned. This does not seem to the court the proper construction. But in any event the multiple table does not select certificates according to what the payments on them have earned. It selects them by chance application of numbers. The difference between the two classes in this respect is one of degree, rather than of quality. One is worse than the other; but both are bad. Other differences need not be noticed.

Stripped of all technical lore, can any one seriously believe that the scheme of the company's business was merely to take the money of purchasers of certificates, invest part of it, and give them back what the part invested earned ? Or that this was held out to pur-

chasers as the real scheme? Does any one believe that purchasers have turned in their money to this company, paid it $4.00 for the privilege of starting, and one fifth of all installments as expenses, simply for the privilege of letting the company invest the other four fifths and give them back such profits as it made? Is it not plain enough to be seen that the real attraction was the appealing to cupidity, and the hope of getting large returns by the use of chance?

The contentions in regard to lapses, the impossibility of the scheme, and the insolvency of the company may be treated together. It is an error in dealing with these matters to treat each as separate and distinct, instead of considering their relation to the scheme as a whole. The fallacy in this mode of treatment may be illustrated by a case of fraud. Considered separately, there is nothing illegal in a man's giving his house and lot to his wife as a home, though he may own nothing else. So, too, as a separate statement, there is nothing illegal about a man's owing debts. But if the two be put together, it is fraudulent for a debtor to give away all of his property to his wife so as to defeat his creditor. In this case where the real question is as to the legality of the scheme of the company, it will not do to segregate the elements of the complaint and deal separately with each, without regard to the whole. To cite the law governing a plea of impossibility of performance, where filed to a suit on a contract confessedly legal, is quite different from considering the nature and character of the promise, and the company's scheme of performing it, in determining whether the scheme is legal or illegal.

Thus it is urged in behalf of the company that a provision in a contract for a forfeiture on failure to pay, or a "lapse," is not illegal. While forfeitures are not favored and equity in proper cases grants relief against them, yet a provision in a contract for a forfeiture or a lapse on failure to pay does not per se render the contract illegal. But whether a number of certificate-holders will or will not fail to pay, and how many will fail, and at what stage of the proceeding, and what amount of previously paid installments will thus be forfeited or gained by the company, necessarily involves an element of chance. While a forfeiture may happen without involving illegality in the individual contract, and accretions be added to the funds, yet if a company whose business is the issuing of bonds, certificates, or promises to pay, must depend for its ability to do so upon this

·chance element, it is an illegal scheme, fraudulent in law, and contrary to public policy. A company may contract with a certificate-holder that a forfeiture of amounts already paid, or a " lapse" shall occur on a failure to make payments. But if a company's business is to promise large numbers of certificate-holders to pay them certain amounts, and as an essential element of ability to pay some of them the agreed amounts it must depend upon the chance of lapses or failure on the part of others to keep their contracts, and consequent forfeiture of sums already paid in, the scheme is essentially one of chance. The mere existence of some good fortune or bad fortune, though involving an element of chance, does not necessarily render a business illegal, if chance is not an integral or essential part of it. Thus the seasons affect the farmer and the merchant. The success or failure of other merchants or dealers may affect one's collections, and his profits and losses. And many other illustrations might be given. Indeed it may be said that all success in business is more or less affected by circumstances beyond the control of the individual considered, and therefore, in a loose and vague way, called chance. But in legitimate business the employment of capital or labor (physical or mental) or both form the foundation, and their legitimate product the primary reward; and the element of chance is not the essential element of the enterprise. This is a wholly different thing from organizing or carrying on a scheme in which chance is a basis or essential element.

As sustaining a contrary theory, the case of Union Investment Assn. v. Lutz, 50 Ill. 176, is cited by defendant's counsel. An examination of that case will show that the paragraph of the opinion ·dealing with this important subject embraces eleven lines, and cites ·one decision, which involved quite a different organization from a bond company dependent on lapses. Rapp's Harmony Society was a religious association in which each surrendered his property into one common stock for the mutual benefit of all, during their joint lives, with right of survivorship, with provisions in regard to furnishing necessaries to the member and his family, and with privilege to secede during the lifetime of the member. Shriber v. Rapp, 5 Watts, 351. The Illinois decision does not consider the distinction pointed out above; nor does it refer to any chance or lottery feature in the mode of distribution. If it meant to hold that for a company to conduct a scheme in which it is dependent upon chance

lapses or forfeitures for its ability to comply with its promises to pay some of its certificate-holders, and where those called in for payment shall be fixed by chance, is legitimate business, it would be neither sound in principle nor sustained by authority, and would be in the teeth of decisions already cited.    The court says of the scheme then being considered, that "it applies the principle of joint tenancy to the investments by the subscribers, the survivorship depending upon default instead of death."    The analogy invoked does not apparently exist.    Death is a certainty, resulting from the operation of natural laws.    The time may not be known, though it may be estimated with some probability by the use of mortality tables.    Default or lapse is a mere chance, which may never happen at all.    If the statement of the Illinois court be correct, such an attempt to apply to a chance event the principle of joint tenancy can have little weight in this State, where joint tenancy itself has been abolished.    Civil Code, § 3142.    This court does not believe that the Supreme Court of Illinois meant to hold any such doctrine.    To do so would be out of consonance with the trend of its decisions.

The effort is made to analogize this sort of scheme to the business of insurance; and especial reference is made to tontine insurance.    What has been said above indicates a wide difference.    It would prolong this opinion beyond reasonable limits to enter into a full discussion of the methods of insurance, and the legality of lapses as incident thereto.    Suffice it to say that, outside of co-operative and assessment companies where the insured are also insurers of each other, all respectable life-insurance companies at this day are believed to lay aside, from premiums paid on ordinary life policies, a reserve which, invested at some reasonable rate, will produce the amount of the policy within the time of the expectancy of the insured.    Many States have laws fixing the rate of interest in calculating life-insurance reserves, or net value of policies.    In this State four per cent. is used, except where a company has a cash capital fully paid up of not less than $100,000.00, when the insurance commissioner may in his discretion employ a rate of from three per cent. to six cent.    Civil Code, § 2049.    The rate of interest which is employed in many States is four per cent. compounded annually.    This is what is considered a reasonable insurance reserve, and a practicable rate of interest,—not 14 per cent., 15 per

cent., or 18 per cent., compounded quarterly, as this company uses in its calculations to figure out estimated results. A tontine policy has been defined to be "a policy of insurance in which the policy-holder agrees, in common with the other policy-holders under the same plan, that no dividend, return-premium, or surrender-value shall be received for a term of years called the tontine period, the entire surplus from all sources being allowed to accumulate to the end of that period, and then divided among all who have main-tained their insurance in force." (Century Dictionary.) This is a modification based upon the original tontine, which was an annuity shared by subscribers to a loan with benefit of survivorship. Lor-enzo Tonti could hardly have foreseen that his plan of survivorship would be claimed as applicable to or as legalizing a company which maintains a redemption fund of fifty per cent. of monthly install-ments paid, which depends for its ability to carry out its promises on the chance of lapses, and which redeems not by equitable divi-sion of all profits among the insured at the end of the tontine period, but calls some for redemption by the use of chance. No insurance company of any standing can probably be found which does any such tontine insurance. If it does, it is running a lottery, not an insurance business. The modern trend of legislation and decisions is rather in the direction of limiting than extending what is loosely called the tontine principle.

Judge Grosscup, in his charge in the McDonald case, 59 Fed. 565, 566, makes use of the following language: "Take, for instance, the life-insurance companies,—those that proceed on the stock plan or on the assessment plan. They require of the member that he pay in a certain amount of money. That is the pecuniary considera-tion. That money is invested, or supposed to be invested, in securi-ties; and when the member dies, a certain amount, stipulated in the policy, is paid to his heirs or the beneficiary named in the pol-icy. That is the return. The man may have been insured but a month, and have paid in but a few dollars, and received back $5,-000.00 or $10,000.00. In such instances as that a much larger sum has been returned than the consideration, but the fact that there was such a return does not make it an unlawful enterprise. Why? Because the prize is not determinable by or dependent upon chance or lot. It is dependent upon the life of a man, and the life of a man is determined by the laws of nature, and not by the chances

of lot." So also he deals with investment in real estate, which enhances in value. In State *v.* Interstate Savings Co., 52 L. R. A. 530, supra, it is said that "contracts of investment security, debentures, or certificates which can not reasonably be expected to accumulate a reserve fund equal to the stipulated endowment values within the stated period, without aid from lapses or appropriation from premiums on new business, are fraudulent, contrary to public policy, and unlawful." This was not a dictum, as insisted. It was a direct decision of a point involved in the case. The above is a copy of a headnote made by the court itself. Courts will use extreme caution in declaring a transaction void on grounds of public policy, and will not lightly infer such contrariety or such adverse public policy. But can there be any question that in this State there is a public policy, clear, certain, beyond doubt, against gaming in every form, or by any name, and against lotteries and lottery schemes or devices, by whatever name called, or under whatever verbiage covered up ? The enumeration of certain contracts as contrary to public policy, in the Civil Code, § 3668, is not intended to be exhaustive, but illustrative. Two citations will suffice to prove this to be true. See *Mercier* v. *Mercier*, 50 *Ga.* 546, 553; *Western & Atlantic R. Co.* v. *Bishop*, Id. 472-3.

This company's capital is only $2,500, of which about one half has been paid in, partly in a desk and office furniture. It has issued hundreds of thousands of dollars worth of certificates; so that the capital is merely nominal, and furnishes no real security. The certificate-holders must look to the amounts arising from the contracts or certificates. Class B certificates begin thus: "The Equitable Loan & Security Company, of Atlanta, Georgia, hereby promises to pay to the order of . . . . . . . . . ., at its home office in Atlanta, Ga., five hundred dollars, subject to the following express terms and conditions: 1st. That the holder has paid four dollars herefor, and agrees to pay to the maker hereof at its home office, without any other or further notice, an installment of one dollar and twenty-five cents on the fifth day of each and every succeeding month hereafter, until one hundred and sixty-eight installments shall have been paid, time being of the essence of this contract, then this certificate shall become due and payable for its full face value." As stated above, the first payment of four dollars goes to the agent, and 25 cents per month of the installments goes to expenses, leav-

ing $1.00 per month, of which sixty-two and one half cents goes to the redemption fund, and thirty-seven and one half cents to the reserve fund. The redemption fund may be used to redeem; and, as already shown, the declared policy of the company is to make re- demptions or "speedy returns to investors." The only fund specif- ically provided to be held in reserve is 37 1-2 cents per month. In 168 months this would aggregate $63.00. If the entire $1.00 per month were held in reserve, it would aggregate $168.00.

According to the sworn calculation of an expert, which has not been denied, $1.00 paid monthly for 168 months (14 years), if in- vested as received at eight per cent. (the highest legal rate in Geor- gia), and compounded annually, would aggregate, both principal and interest, at the end of the time $302.20, as against $500.00 maturity value. It is perfectly evident that no rational or reasonably pos- sible investment of or interest on either $63.00 or $168.00 can pro- duce $500.00 in the given time. Especially is this true when it is remembered that the entire amount is not received at the begin- ning of the period, but is paid in monthly installments, and there- fore has an average earning capacity for only one half of the whole time.

It is suggested that there is no real binding promise to pay $500- .00; that the naming of that amount is not a substantial part of the contract; that the company may redeem all of its certificates at any time previous to maturity, even to the last minute, at a less amount, and can thus at its option avoid ever having to pay the full sum. The error of this suggestion is twofold. In the first place, the certificates have been issued at various dates, running through several years. They therefore will fall due all along at different times. If the company adheres to its table, it can not select to pay any particular certificates, as they are about due, less than the full amount, on account of its redemption privilege before maturity. Nor can it select and call them before maturity, unless they happen to bear the tabular numbers for calling, or unless it can and will wind up and pay off all certificates when the first fall due, which is evidently not the purpose or scheme, for new certifi- cates are continually being issued (though called by a different class name). The second error in this suggestion (though evidently not thought of in making it) is this: The very first thing in the cer- tificate is a promise to pay $500.00 at maturity. It is printed in

large type — the most prominent thing in the certificate. It is true that it says that this is subject to " the following express terms and conditions," which are then printed in small type, and some of them in rather uncertain, if not ambiguous, expressions, as will be seen by reading them.     But in one of its pamphlet publications, stated on its face to have been copyrighted in 1895 by its secretary, and therefore emanating, not from its soliciting agents on the road, but from headquarters, occurs this statement:  " Twenty certificates purchased in the Equitable Loan & Security Company, if carried to maturity, will pay you TEN THOUSAND DOLLARS, yielding a clear profit of $5,720.00."     Beyond question the company held out, as part of its plan of operation, the paying of $500 on some certificates.     To hold that it printed its $500.00 promises in bold type, and sent abroad its pamphlets construing and illustrating its plan, but never really intended any such thing, and that these statements are mere surplusage in the contract, and not to be considered in ascertaining the duties or the liabilities of the company, or the legality of the scheme, would look very much like branding it as fraudulent in its origin.     This court prefers to give the company a more liberal and charitable view, and not to hold men of the character and standing of the president, ex-president, and others who have been connected with it, guilty of wilful fraud. A scheme which for its carrying out and distribution of payments must rely upon the element of chance may be illegal, but it is less reprehensible than if it were branded as fraudulent, misleading, and deceptive.     The one may involve a mistaken notion of what the law will permit; the other would involve moral turpitude.

The only rational possibility for the company to ever pay off certificates as they mature at $500.00 each, or any considerable part of them, depends on the chance element that a large number of certificate-holders will fail to keep up their payments, and thus what they have already paid in will be forfeited.     It is not necessary to appeal to conflicting evidence to show what part lapses play in this scheme.     In one of the affidavits of the expert, offered in evidence by the company, he says:  " The books of the defendant show $306,-466.62 to the credit of the redemption fund, and $221,912.40 to the credit of the reserve fund, making a total to the credit of the two accounts of $528,379.02.     In making up his statement, deponent did not consider these accounts as they appear on the books,

but took instead the amount actually paid into these accounts by certificates in good standing ($408,408.00). The difference in the two amounts shows the profits from lapses, to wit, $119.971.00, which amount is included in total profit of $243,709.82, shown on foregoing statement." In other words, out of $243,709.82, stated as profits and treated as such in determining the values of and ability to redeem certificates, this witness estimates $119,971.00 as the profit from lapses. In a published statement dated Feb. 28, 1902, it appears that prior to that time there was a "total amount paid on certificates that have lapsed (forfeited), $153,659.00." In one of the pamphlets already referred to as issued by the company occurs the following: "We issue without a single forfeiture, but we know from experience and statistics that more or less of our certificate-holders will lapse, and that accretions from fines will be an additional large source of profit, but from the very terms of our certificates every dollar realized from both of these sources must go to the credit of those who do not lapse, and not for the private profit of a few, thus rendering possible an early payment of certificates at a handsome profit above the rate of interest earned upon loans." Note the words, "thus rendering possible," etc. Do not lapses form an essential element, a sine qua non, of the scheme?

Of the cases relied on by counsel for the company, in Chancy Park Land Co. v. Hart (Iowa), 73 N. W. 1059, where a body of land comprising a number of lots according to a survey was sold, and various persons subscribed and agreed that the lots should be divided or apportioned among them "in such manner as they might decide," and where they did hold a meeting and adopted a plan to assign the various lots by drawing slips from boxes, suggested by one of their own number, and not induced or caused by the promoters of the sale, took the lots so respectively assigned, and gave contracts therefor, it was held that there was no scheme of lottery on the part of the promoters of the sale, preventing a recovery of the purchase-price. If the sellers had distributed lots of unequal value, by chance, it would have been different. Woodell v. Shotwell, 3 Zab. 465. Kohn v. Koehler, 96 N. Y. 362, and Ex parte Shobert, 70 Cal. 632 (11 Pac. 786), are in conflict with the decision of the Supreme Court of the United States in the Horner case, and are there expressly disapproved; and also in Ballock's case, 8 L. R. A. 671, 672, by the Supreme Court of Maryland.

From the foregoing discussion it will be seen, that, by the evidence introduced by the company itself and its letters and published statements, the following things are established : (1) The payment of a consideration. (2) The use of chance. (3) Prizes, consisting in inequality of payments, resulting from the use of chance ; and this inequality is not in time only, but in amounts, and does not result merely from increase or decrease of assets from loans or investments (if indeed that would be legal where the certificates redeemed or subjected to this inequality are determined by chance), but primarily from the chance element of lapses and amounts arising therefrom.    And from the same sources, together with the application of a simple calculation, it appears (4) that the business of this company is to issue a large number of certificates or promises to pay, and that it depends, and must depend, for its ability to comply with them upon the chance of many lapses or forfeitures.    As matter of law, the court holds that such a business or scheme is illegal, and is contrary to public policy.

6. It is contended by the company, that, if the court should hold the scheme or plan of its operations to be tainted with illegality, as embodying a lottery feature or similar device, nevertheless plaintiffs and others who purchased certificates may be classed as particeps criminis and in pari delicto, that is equally at fault, and can have no relief in equity.    A number of decisions have been cited on this subject, a review of all of which would require much time and be unnecessary.    It may be said generally that where an illegal contract is executory, it will not be enforced by the courts, nor can damages be recovered for its breach.    Wherever a party has to set up and rely on such a contract to sustain his claim, the courts will not aid him.    So, too, an illegal contract will not be indirectly enforced, as for instance, to furnish a measure of damages in a suit against a telegraph company for a mistake in sending a message. *Cothran* v. *Western Union Telegraph Co.*, 83 *Ga.* 25.    While the decisions are not uniform on the subject, the weight of authority, including decisions of the Supreme Court of this State, is that one party to such a contract can not generally have an accounting in equity against the other for the proceeds or profits of the mutual illegal venture.    Nor, it has been said, will a court enforce equities in such illegal proceeds, where to do so would be substantially to enforce the contract.    *Exchange Bank* v. *Loh*, 104 *Ga.* 446, 459.    (Though

in fact the contract there was held to be legal, and what was said on this subject was perhaps unnecessary.)    In these and similar cases, whether specific performance, damages, injunction, or accounting for proceeds or profits between the parties was sought, it was a necessary part of the case to set up and rely on the illegal contract or illegal conduct of a party in pari delicto.    So far as this may be sought, it can not be granted.

In *Ingram* v. *Mitchell*, 30 *Ga.* 547, 550, it is said: "The rule hitherto applied by this court, and perhaps by the English courts is this: that whenever the plaintiff can make out his case without invoking the illegal contract to his aid, he is entitled to recover." In *Raleigh & Gaston R. Co.* v. *Swanson*, 102 *Ga.* 754, it is said that "A party to such a contract can not recover in an action which does not seek to disaffirm but to enforce it by suit for its breach." In *Clarke* v. *Brown*, 77 *Ga.* 606, it was held: "Where a principal deposited money with his agents to be used in the purchase of futures in pork and grain, he could recover from such agents the amount so deposited, in an action for money had and received.    He could not set up the illegal contract to recover profits realized thereunder, nor could the agents set up the illegal contract for the purpose of defeating a recovery by the principal of the money deposited with them, and which was held by them.    It did not matter whether the money sued for by the principal was the identical money furnished by him, or whether the agents deposited the money in bank with other deposits of theirs, and used such money for filling margins for futures, and afterwards replaced them to the credit of the principal.    The question is, whose money is it, the agents' or the principal's?    Nor does this stand in the position of an executed contract, in which both parties are in pari delicto."    See also Tennant *v.* Elliott, 1 Bos. &. Pul. 3; Farmer *v.* Russell, Id. 296; Cook *v.* Sherman, 20 Fed. 167, 170.

If an illegal contract is executed, and the parties are in pari delicto, that is equally in fault, equity will not aid one against the other in recovering what has been paid; but will leave them where it finds them.    If executed in part only, the rule can not be stronger than if executed in full.    But if the parties are not in pari delicto, the rule does not apply.    "When both parties are at fault, and equally so, equity will not interfere, but leaves them where it finds them.    The rule is otherwise if the fault of one overbalances, decidedly, that of

the other." Civil Code, § 3937. In Clark on Contracts, 493-494, occurs the following: "This rule is expressed in the maxim, 'In pari delicto potior est conditio defendentis'; that is to say, where the parties are equally at fault, the condition of the defendant is the better. . . There are some exceptional cases, however, to which this maxim does not apply, cases in which a man may be relieved from an illegal agreement. These may be grouped as: (a) Cases in which a locus pœnitentiæ remains, and while the agreement is unperformed, money or goods delivered in furtherance of it are allowed to be recovered. (b) Cases in which the parties are not regarded as being in pari delicto; as (1) where the party asking relief was induced to enter into the agreement under the influence of fraud or strong pressure, or (2) where the law which makes the agreement unlawful was intended for the protection of the party asking relief." In the case of *Raleigh & Gaston R. Co.* v. *Swanson,* 102 *Ga.* 760, the Supreme Court of Georgia quotes this authority with approval, and says that the exceptions stated by the author "are undoubtedly sustained by good authority." In Clark on Contracts, 500, it is said: "It is also held that the parties are not to be regarded as being in pari delicto where the agreement is merely malum prohibitum, and the law which makes it illegal was intended for the protection of the party asking relief." In 15 Am. &. Eng. Enc. L. 1004, 1005, 1007, similar principles are announced, but even more strongly; and it is further said: "And when a contract is prohibited by statute and a penalty imposed on only one of the parties for a violation of the statute, the parties are not necessarily in pari delicto, and when equity requires it the court may afford relief to the party upon whom no penalty is imposed."

In Jones *v.* Golightly, 2 Wm. Bl. 1073, it was held that money paid to a lottery-office keeper as a premium for an illegal insurance of a ticket may be recovered. It is said that " the statute is made to protect the ignorant and deluded multitude, who in hopes of gain and prizes, and not conversant in calculations, are drawn in by the office-keepers." See the notes to that case. In Browning *v.* Morris, 2 Cowper, 790, 792, 793, it was held that a lottery-keeper could not recover money paid by him, he being the principal offender. Lord Mansfield said : " It is very material that the statute itself, by the distinction it makes, has marked the criminal; for the penalties are all on one side; upon the office-keeper." So in Georgia,

the punishment is placed upon the person selling or furnishing lottery tickets; not upon the purchaser.    In President v. Atlas Bank, 3 Mass. 581, 585-586, it is said: "To have decided otherwise would have given effect to an illegal contract in favor of the principal offender, and would have operated as a reward for an offense which the statute was intended to prevent."    There is no par delictum in the present case, either as matter of law or of fact.    See also 1 Pom. Eq. Jur. § 403; 2 Id. §§ 929, 941, 942; 1 Story's Eq. Jur. (13th ed.) 300; Duval v. Wellman, 124 N. Y. 156 (26 N. E. 343); Mount v. Wardell, 7 Johns. 434, 441 (insurance paid on lottery ticket recovered); Parkersburg v. Brown, 106 U. S. 487 (3); Thomas v. Richmond, 12 Wall. 349 ; White v. President, 22 Pick. 181; Bowditch v. New England L. Ins. Co., 141 Mass. 292, 295-296 ; Ford v. Herrington, 16 N. Y. 285 (opinion of Bowen J., concurred in by five of the other Justices, there being eight in all); Oneida Bank v. Ontario Bank, 21 N. Y. 490 ; Davidson v. Carter, 55 Iowa, 117; Bateman v. Robinson, 12 Neb. 508 (2); Reynolds v. Sprye, 1 De G., M. & G. 658 ; Sykes v. Beadon, L. R. 11 Ch. Div. 197, supra; *Callaway* v. *Mayor*, 48 *Ga.* 311, where it is said: "It is hardly possible to conceive a case, except in certain instances of pari delicto, where a party illegally obtaining money can not be made to pay it back."    In Branham v. Stallings (Col.), 40 Pac. 396, the case was not between the company conducting the scheme and the purchaser, but the plaintiff was an organizer and active participant and was in pari delicto.

7. A few words as to the pleadings.    That there are some parts of the plaintiff's pleadings which are not well set forth and can not withstand a special demurrer, but will have to be amended, is quite clear.    For instance, to copy an affidavit as a part of a paragraph of a petition is more rhetorical than exact; and there are other instances.    There is also some contrariety of views among the pleaders on certain subjects; but this is not surprising.    If holders of certificates thought the scheme illegal, there was an auditor's report for them.    If some of them think the court has approved the plan and now ask about redemption, they are met with a statement that the company is not compelled to redeem.    If they say that it can not pay the $500.00 named in the certificate, the reply is that it is not bound to do so, but may pay less at any time before maturity. If the redemption fund is asked about, the answer is that the com-

pany "may" redeem before maturity, but need not. If they point to the statements of the company and its agents as to its basal principles, it is said that these are not in the certificate. Is there any wonder that the petitioners and intervenors have brought their legal woes, and, piling them in a sorrowful if somewhat inartistic mass before a court of equity, have asked such aid as equity could give? On a smaller scale comparison may be made with the pleadings in 7 Johns. 434, supra. Civil Code, § 4833. If amendment is necessary, it can be made. Among other things, the pleadings do make the points treated of in this opinion; allege that "the scheme of defendants is fraudulent, unlawful, and contrary to public policy, that it is impossible now for defendant company to redeem its certificates at redemption value, and that it will be eqally impossible for it to redeem its certificates at the maturity value; and they pray for a receiver, to have the amounts paid in by certificate-holders determined, and for judgments for the sums which may be respectively due them," etc.

That some may file a petition on behalf of themselves and others is rudimentary law. Civil Code, § 4842. Nor does the fact that some of the certificate-holders have joined with the company change this. If so, there could never be a representative petition by bond-holders, stockholders, or the like, if officers of the company attacked, or their friends, should see fit to buy some bonds or stock, and join with the company in the fight. What appeared at first blush to be a voluntary uprising of quite a lot of certificate-holders was explained, to a considerable extent, by evidence which showed that the company or some of its employees conferred with a friendly certificate-holder, and furnished a list of addresses to him; and that a circular letter was sent out, setting forth an effort to wreck the company, and suggesting the signing of a blank form enclosed, authorizing an attorney to represent the signers in opposing a receivership, without any charge of fee against them. The attorney does not seem to have had anything to do with this, but, on behalf of himself and some others, bona fide objected to a receiver; and he was no doubt surprised at the amount of moral support which was offered him, unaccompanied by any fee. He is, however, in no way subject to criticism.

It is suggested that this is not a representative petition. But why not? A holder of a Class A certificate, and numerous holders

of Class B certificates, are parties. By the terms of the certificates of Class B it is said that all the assets are liable; so that if both were valid, Class C would be subordinate, or at least not superior, to Class B. But if the scheme is illegal, as has been held, the real classification is as to certificate-holders or persons whose money has been paid to the company for certificates, and it is immaterial whether the illegality is classified as A, B, C, or some other letter. If an order of court is needed to declare this a representative proceeding, it can and will be granted.

8. Shall a receiver be appointed ? Precedent on this subject is necessarily limited; because companies of this sort are modern inventions. In McLaughlin v. National Bond Investment Co., 64 Fed. 908, supra, it was held that a receiver would be appointed. In Parkerson v. Brown, 106 U. S. 487 (4), supra (not a case concerning a bond company, but one of illegal contract where the parties were not in pari delicto), there was a prayer for a receiver, but none was applied for; but it was held that equitable methods would be applied. See also Peltz v. Supreme Chamber etc., 11 Atl. 668, 671, supra. In regard to this very company the Supreme Court has recognized that a receiver might have been appointed without error, but, under the facts as then presented, held that the requirement of bond was not an abuse of discretion. *McMillan* v. *Equitable Loan Co.*, 102 *Ga.* 575. The facts in the present case are far stronger than in that. Civil Code, §§ 4900, 4904; *Wolfe* v. *Claflin & Co.*, 81 *Ga.* 64; *Cohen* v. *Myers*, 42 *Ga.* 313; *Orton* v. *Madden*, 75 *Ga.* 83; *Albany Co.* v. *Southern Agricultural Works*, 76 *Ga.* 135. If the preceding part of this decision is correct, here is a corporation, with a nominal capital stock of $2,500.00, the visible portion of which in hand is in the shape of some office furniture, taken second hand eight years ago, conducting a business which this court holds is illegal, and as a result of it in possession of several hundred thousand dollars of assets, arising from payments by many people, who, not being in pari delicto with it, are entitled to recover on account thereof; and which fund the company is not entitled ex equo et bono to hold against them. Many of these payments are small, and to remand each of the persons who made them to a separate suit would be a practical denial of justice to them, would entail a great number of suits and large amounts in costs. If the company is allowed to continue to operate and use the fund

or assets in ways herein held illegal, these numerous parties are in danger of loss.

It is said that most of the cases in regard to "investment" or "debenture companies" arose on criminal prosecutions for conducting lotteries, or proceedings to forfeit charters. But it must be remembered that in criminal cases laws are construed strictly; and if the schemes were lotteries to the extent of being criminal, it would certainly furnish no argument against a like holding in a civil case. The trouble with this scheme is not a mere excrescence which may be lopped off and the wound covered with a new letter of the alphabet. It is fundamental. To eradicate it is to eviscerate the scheme itself. Under our code, if a charter is forfeited, after paying "debts" the balance is to be divided among the stockholders. Surely it can not be claimed that if the scheme of this company's business is illegal, the sole remedy is to forfeit the charter and give to its three or four stockholders payments made by the certificate-holders. The public may also have a remedy. But this does not affect the rights of individuals to proceed for their protection.

Finally, it is urged that the appointment of a receiver will work injury. But the courts did not originate the scheme, nor is there anything in the charter indicating the use of chance or the like. If there is injury to the company from its methods, it can not complain that it gets hurt. To those who wish to proceed in the hope of winning prizes by chance from the failure or misfortune of others, this chance will be lost. They can not lawfully do so. But to the many whose small monthly payments represent days of toil and nights of waiting, and who would fall by the wayside (in the language of the company) "thus rendering possible an early payment of certificates at a handsome profit above the rate of interest agreed upon," something may be saved, and their little accumulations may be rescued from the coming "lapses." In surgery or in law, the knife always hurts. But on proper occasion it must be applied. As already stated, this decision does not quote affidavits introduced for the plaintiffs in cases of conflict. To do so would make the case much stronger. But the court deems it made out by the evidence and statements of the defendant company and its officers. It may be assumed that they thought they had gotten beyond the prohibition of the law; but the court can not agree with them. It matters not how personally honorable may be the gentle-

men connected with this company, or how mistaken they may be; the law must be declared. The legal principles involved ought to be, as they have been, fully decided, that others may not make the same mistake. Or, if it should be held to be a legitimate scheme of business, and violative of no public policy, to gather in by chance lapses and divide unequally by the use of chance numbers, to hold out as an inducement "handsome profits" to be thus derived and divided, and so to foster the spirit of gain by chance, it should be known that such is the law of this State; so that other companies, which have been stopped in Ohio, in Pennsylvania, in Louisiana and in other States, may change the formula of their certificates, and, using words of permissive sound, may find protection beneath the three-pillared arch and feel that they have a guardian sentinel in him who stands with drawn sword in every impress of the great seal of Georgia.

In addition to the authorities cited to show that Civil Code, § 3668, does not, and does not intend to, enumerate all contracts contrary to public policy, see *Central R. Co.* v. *Hunt*, 113 *Ga.* 514, 516 et seq.; *Sessions* v. *Payne*, Id. 956; *Berry* v. *Cooper*, 28 *Ga.* 543 (4); Hutchinson on Carriers (2d ed.), § 250. In the first case cited, and other like cases, where a contract has been included in a bill of lading, seeking in whole or in part to exempt the common carrier from the effects of the negligence of itself or its servants, the shipper, though signing the contract, could recover for damages as such accruing from negligence of the carrier, nowithstanding such limitation, and the bill of lading could of course be used in evidence. The public policy was against allowing the stipulation for exemption, and was in favor of the protection of the public. To hold that because the shipper signed the contract he would be in pari delicto would defeat the very end which the public policy sought to accomplish. And in the present case public policy is best subserved by allowing a recovery of their money by buyers of certificates rather than by enriching the company, or what the English courts call the "office-keepers." They are not at all on a plane of equality.

After stating that the allotment made by the defendant's expert fixed the present value of many certificates at less than the actual amount paid in, it is stated that this is true of certificates running back to January, 1899. This is believed to be the correct date;

and that all certificates issued since then are in the condition mentioned. But whether that date is exact or only approximate would not make the slightest difference in the principle announced, or in the illustration then being given. The point being made was to show that in the allotment or "apportionment" the present value fixed on a large number of certificates—including those issued during several years past—was less than the actual cash paid by the purchasers to the company; and if under the multiple table the number for redemption should reach one of these, there would be actual loss. Back of that time are quite a large number of certificates as to which the allotment or "apportionment" fixes values at more than the actual cash paid in, but less than such payments with eight per cent. interest, named in the certificate. If the redemption number should fall on one or more of these, they would get something above actual payments, but not as much as eight per cent. interest on them. Then there are some as to which the values fixed or estimated equal or exceed the amounts paid in with eight per cent. interest. It is true that the company had made a calculation based on the $1.00 per month which went to the redemption and reserve funds; but besides this the certificate-holder has paid the preliminary amount of $4.00, and 25 cents per month; and the valuations do not include these or make any reference to them. Besides interest runs regularly according to date. The multiple table does not, but skips according to a sort of geometrical progression.

*Hoke Smith & H. C. Peeples, Candler & Thomson, Rosser & Brandon, H. E. W. Palmer,* and *E. W. Butler,* for plaintiffs in error.

Construction of contract: 17 Am. & Eng. Enc. L. (2d ed.) 17, 18, 23; Civil Code, § 3675, par. 3. Certificate B evidences legal contract, not scheme in nature of lottery: Citations in opinions, and Chancy Park Land Co. *v.* Hart (Iowa), 73 N. W. 1059. Difficulty or improbability of accomplishing undertaking will not avoid: Civil Code, §§ 2663, 3725; The Harriman, 9 Wall. 161, 170 et seq.; 1 Add. Con. 327; 1 Pars. Con. 476, 478; 2 Id. 786; Chit. Con. 734; Bish. Con. §§ 611-13, 619, 625; Clark, Con. 182, 678; 32 Am. Dec. 518; 72 Id. 373; 82 Ala. 302; 38 Mich. 172; 1 El. Bl. & El. 746; 59 Mich. 488; Aleyn, 26; 5 R. C. 223; L. R. 6 Q. B. 115; 40 L. J. Q. B. 80; 23 L. T. 803; 19 W. R. 276. Fulfilment of contract legally possible by real estate profits and discount of

notes; and not dependent on usury : *Campbell* v. *Morgan,* 111 *Ga.*
200; *Zellner* v. *Mobley,* 84 *Ga.* 748; *Scott* v. *Williams,* 100 *Ga.* 540;
Civil Code, §§ 2886, 2888; Hanover N. Bk. *v.* First N. Bk., 109
Fed. 426; 21 D. C. 199; 14 So. (Ala.) 412; 54 N. W. 366; 18
S. W. 1034; 15 S. W. 472; 3 Pars. Con. 124; Smith, Con. 151.
As to lapses : 46 Am. St. R. 138; 26 Am. & Eng. Enc. L. 61, 62;
Shakey *v.* Hawkeye Ins. Co., 44 Ia. 504; Blakely *v.* Cont. Ins. Co.,
5 Ky. L. R. 423; Epstein *v.* Mut. Aid Asso., 28 La. Ann. 938;
Beadle *v.* Chin. Ins. Co., 3 Hill, 161; Redfield *v.* Pat. Ins. Co., 6
Abb. New Cas. 456; Un. Cen. Ins. Co. *v.* Channing, 28 S. W. 117;
Abber *v.* Penn. Ins. Co., 18 W. Va. 400.　Public policy : *Smith* v.
*DuBose,* 78 *Ga.* 435 ; Kellogg *v.* Larkin, 56 Am. Dec. 164; 21 Fed.
699 ; 2 Bing. 229, s. c. 9 Eng. C. L. R. 557.　Plaintiffs not entitled
to relief; they do not come with clean hands, if contract illegal :
114 *Ga.* 548; 113 *Ga.* 531; 112 *Ga.* 850; 104 *Ga.* 446, 459;
102 *Ga.* 754, 808; 93 *Ga.* 520; 85 *Ga.* 468, 734; 83 *Ga.* 25; 82
*Ga.* 372; 79 *Ga.* 796; 75 *Ga.* 366; 71 *Ga.* 798; 68 *Ga.* 128; 65
*Ga.* 129; 61 *Ga.* 328; 41 *Ga.* 315; 30 *Ga.* 547; 21 *Ga.* 46; 11 *Ga.*
547; 55 *Ga.* 417; 3 *Ga.* 176; 1 Cowp. 197; 61 Fed. 993; 41 Ill.
181; 55 Ill. App. 213; 2 Pars. Con. 789, 869; 40 Pac. 396; 31 N.
E. (N. Y.) 516; 23 N. J. Eq. 257, 261, 263; 47 Am. Dec. 258; 17
Am. St. R. 445; 11 Id. 667; 23 Id. 624; 3 Id. 706; 31 Pac. 581;
17 Am. R. 11; 13 S. W. 393; 19 S. W. 274; 52 Pac. 553, 557;
30 Am. R. 106, 112; 83 Fed. 384; 120 Mass. 915; 30 N. J. Eq.
259; 20 N. E. 203, 209, 213; 57 N. Y. 538; 11 Am. R. 56; 44
Id. 210; 52 Id. 213; 12 Am. Dec. 337; 40 Id. 419; 27 Id. 226;
19 Me. 335; Clark, Con. 493; 174 U. S. 639, 640, 655-668; Tyler,
Usury, 746.

　Gaming contracts, lotteries, etc.: 33 Hen. VIII, c. 9; 16 Car. c.
7; 9 Ann. 14; 12 Geo. II, c. 28; 13 Geo. II, c. 19; 18 Geo. II, c. 34;
Cobb's Dig. 726; *Alfred* v. *Burke,* 21 *Ga.* 46; *Dyer* v. *Benson,*
69 *Ga.* 609; 14 Am. & Eng. Enc. L. 586, 599, 600, 623; 17 Id.
357; Prince's Dig. 976; Acts 1866, pp. 148-9; 29 *Ga.* 619; Code
of 1863, §§ 752-4; Code of 1873, §§ 4548-9, 5015; Acts 1877,
p. 172; Acts 1880-81, p. 62; 25 *Ga.* 664; 14 *Ga.* 255.　Suit by
some for all of class : 1 Dan. Ch. Pr. 240, 242, 244; 17 Am. &
Eng. Enc. L. (2d ed.) 185.　Receiver not appointed : 101 *Ga.* 178;
107 *Ga.* 562; 98 *Ga.* 184; Civil Code, §§ 2716, 4901-2; 47 Fed.

755; 5 Thomp. Corp. § 6836; 2 Beach. Corp. § 715; 1 Mor. Corp. § 285; Smith, Rec. § 5; 17 So. 522; 23 S. W. (Tex.) 819.   Fraud, and representations by agents:   34 N. E. (Ill.) 153; 36 N. E. (Ind.) 269;  107 *Ga.* 352; 109 *Ga.* 625; 76 *Ga.* 754; 90 *Ga.* 289; 101 *Ga.* 594, 820; 96 *Ga.* 123; 2 Thomp. Corp. § 1431; 1 Add. Con. § 312; 100 *Ga.* 628; 68 *Ga.* 100; 111 *Ga.* 847; 106 *Ga.* 80, 589; 12 *Ga.* 61; 102 *Ga,* 260, 720, 820; 104 *Ga.* 272; 95 *Ga.* 652; 26 *Ga.* 246; 25 *Ga.* 244; 105 Fed. 373; 66 Fed. 185; 154 U. S. 625; 86 N. W. 189; Clark, Con. 346; 60 *Ga.* 157, 383; 70 *Ga.* 794; 80 *Ga.* 395; 97 *Ga.* 400, 808; 109 *Ga.* 446; 96 *Ga.* 123; 90 *Ga.* 289; 76 *Ga.* 754; 93 *Ga.* 778; 52 *Ga.* 149; 59 *Ga.* 851; 105 *Ga.* 34; 110 *Ga.* 850; 34 Mo. 316; Clark, Con. 331-4; 4 Thomp. Corp. §§ 4922, 4917; 39 S. W. 328; 1 Gr. Ev. § 275; 114 *Ga.* 937.

*John L. Hopkins & Sons, Brown & Randolph,* and *G. T. & J. F. Cann,* contra.   For their citations see the opinions.

Cobb, J.   This case is here upon a bill of exceptions of the Equitable Loan and Security Company, assigning error upon an order of the judge of the superior court of the Atlanta circuit, placing its entire assets in the hands of a receiver for administration.    The reasons for appointing the receiver were, that the scheme of the company, if not a lottery, was, to say the least of it, in the nature of a lottery, and was therefore illegal; that the contracts evidenced by its certificates were impossible of performance by legal methods; and that such contracts were contrary to public policy.   The court did not base its judgment upon the ground that the officers of the company had been guilty of malfeasance, misfeasance, or breach of trust.    The court found that the officers of the company had not been guilty of any personal dishonesty or peculation in dealing with the assets of the company, but held that the scheme was illegal. The court also found, that, if the scheme of the company was legal and its contracts valid, any deception which may have been practiced upon any of the certificate-holders was not of such a character as to require the appointment of a receiver; that while such certificate-holders might have their remedy by a rescission of the contract, there was nothing in the evidence authorizing the appointment of a receiver on this ground.   The court did not appoint a receiver on the ground of the insolvency of the company, and did not make any finding in terms on the question as to its solvency

or insolvency.    The court also found that the company, under its charter, was authorized to make investments in real estate, and that the certificate-holders had no right to complain that the charter had been so amended as to authorize the company to engage in this business.    It will thus be seen that the first question to be determined is whether the scheme of the company was illegal.    In order to fairly pass upon the question of the legality of the scheme, it is necessary to take into consideration the origin and history of the company.    The original charter of the company was granted on January 30, 1894, under an order of Fulton superior court.    It authorized the company to carry on the business of dealing in stocks, bonds, notes, and securities of every description, with a right to negotiate loans, charge commissions, and loan money upon collaterals, mortgages, or other security.    It also authorized the company to issue investment bonds and certificates, to be paid for by the investor in monthly installments, or otherwise, the plan to be fully set forth in the certificates or bonds.    The amount of the capital to be employed was fixed at $2,500, with the privilege of increasing it to $100,000.    By an amendment to the charter, granted March 26, 1896, the company was authorized to purchase, improve, lease, sell, and dispose of or use in any way it might see fit, property of any description, real or personal; to execute notes, bonds, and other obligations, and to secure the same by deed of trust, or other form of security, including the right to guarantee the payment of obligations of other persons, natural or artificial; to pursue the plan of national or other building and loan associations, should its directors see fit to adopt such plan of operation in whole or in part.    This amendment to the charter was accepted by the company on March 31, 1896.    Shortly after its incorporation, the company issued an investment certificate, which is styled "Class A."    The following is a copy of one of such certificates:

"The Equitable Loan and Security Company, of Atlanta, Georgia, promises to pay to ———— of ———— or order, at its home office in Atlanta, Ga., five hundred and five dollars and fifty-four cents ($505.54), upon the following express terms and conditions:

"1st.  That there shall be paid by the holder to the maker hereof, at its home office in Atlanta, Ga., without any other or further notice, an installment of one dollar and twenty-five cents ($1.25) on the fifth day of each and every succeeding month hereafter until

one hundred and thirty installments shall have been thus paid, time being of the essence of this contract.

"2nd. That the holder hereof shall surrender for cancellation this certificate, whenever the same shall be called, upon the payment to him of its then redemption value; the maker reserving the right to call and pay the same before maturity, under the following rules and regulations.    Certificates paid before maturity shall be paid in the following order, to wit: The first paid shall be number one, the second paid shall be number three, the third paid shall be number nine, the fourth paid shall be number two, the fifth paid shall be number six, the sixth paid shall be number eighteen, the seventh paid shall be number twenty-seven, the eighth paid shall be number four, the ninth paid shall be number twelve, the tenth paid shall be number thirty-six, and so on, according to the table which is printed on the back hereof, and which table is hereby referred to and made a part of this contract.

"3rd. That the redemption value of this certificate, if paid prior to its maturity, shall be fifteen dollars if paid one month after date, eighteen and 5-100 dollars if paid two months after date, twenty-one and 11-100 dollars if paid three months after date, twenty-four and 18-100 dollars if paid four months after date, twenty-seven and 26-100 dollars if paid five months after date, thirty and 35-100 dollars if paid six months after date, and so on, the redemption value increasing three dollars with each installment paid, besides interest at the rate of four per cent. per annum on the redemption value of said certificate for the month next preceding the date of redemption hereof.

"4th. That of each and every installment paid as aforesaid the maker hereof shall place twenty-five cents to a reserve fund, which shall be used and held for the protection of all live outstanding certificates issued by this company; and seventy-five cents to a redemption fund, which may be used as follows: (*a*) For paying certificates issued by this company in the order and manner that they shall mature.    (*b*) For paying off and retiring certificates prior to their maturity, according to the terms hereinbefore stated.    (*c*) For paying the heirs, executors, or administrators of any deceased holder hereof the sum that installments paid by such deceased may have contributed to the redemption and reserve funds, provided said certificate is in full force at death of holder and satisfactory proof of

such death is furnished the maker hereof within sixty days after death occurs; and the remaining twenty-five cents, and all transfer fees, shall be used for the expenses of said Company.

" 5th. That a failure to pay any one of said installments when due subjects the holder hereof to a fine of fifty cents, which, together with the omitted installment, must be paid by the fifth day of the next succeeding month; and if said installment and fine are not paid within the said time, then this certificate shall be null and void, and of no value, and the holder hereof forfeits all payments and fines; provided, however, that this company will reinstate said certificate at any time within three months after such forfeiture, upon the holder hereof first paying all dues hereon, together with fines assessed at the rate of fifty cents for each payment in default. If this certificate shall, according to the plan of redemption herein stated, become payable after it shall have been forfeited, and before its reinstatement, then it shall be entitled to payment the next month after its reinstatement. And provided further, that after sixty monthly installments shall have been paid in the manner herein provided, and all other stipulations herein shall have been fully complied with by the holder hereof, and such holder shall thereafter default in any subsequent installment, the maker agrees to issue to such defaulting holder a new certificate which shall bear the next unsold number, for an amount equal to the payments made on such defaulted certificate, less the amount deducted for expenses, which new certificate thus issued shall be non-assessable and shall bear interest at the rate of four per cent. per annum, and shall be payable in its regular order as per plan of redemption herein stated; provided application for such new certificate shall be made to the home office of the Company and the old or defaulted certificate surrendered within three months after such defaulted certificate shall be cancelled on the books of the Company.

" 6th. That all receipts from fines shall be paid into the redemption fund.

" 7th. That the contributions to the reserve and redemption funds may be loaned to the holders of certificates issued by this Company, upon terms and security to be accepted by the Board of Directors; provided that not more than one hundred dollars can be loaned on account of any one certificate, and no loan can be made for a longer time than five years.

" 8th. That after the reserve fund shall have reached the sum of one hundred thousand dollars, the interest earnings therefrom may, at the option of the Board of Directors of this Company, be applied to the redemption of certificates then in force issued by this Company. And when the reserve fund shall have reached the sum of two hundred thousand dollars, then fifty per cent., or any other portion of all the further current contributions thereto, may be applied to the redemption of certificates in force in like manner with the interest thereon, when the Board of Directors shall so authorize.

" 9th. That no transfer of this certificate shall be valid or binding on the maker hereof until such transfer has been made in writing hereon, and the same duly recorded on the books of the Company at its home office; and for each transfer a fee of One Dollar must be made before a transfer will be made.

" 10th. That each and every transferee of this certificate accepts it subject to all the stipulations herein.

" 11th. That no statement made by any one except as herein set forth shall be binding on this Company.

" 12th. That no part of the Reserve, Redemption, or other fund shall ever be loaned to any Officer or Director of this Company.

" 13th. That no part of the Reserve or Redemption fund shall be loaned, *except* (A) upon improved real estate within the incorporate limits of the city in which it is located, and then not in excess of 50 per cent. of its cash market value; (B) Upon Government, State, County, or City Bonds that have never defaulted the payment of interest; and this provision can never be changed except by the consent of every holder of live Certificates issued by this Company in Class " A."

" *In Witness Whereof,* this Company has caused this Certificate to be executed in its name and behalf, under its corporate seal, by its President and Secretary." (Dated and signed.)

The following appears upon the back of the certificate:

## TABLE REFERRED TO IN THE BODY OF THIS CERTIFICATE.

READ FROM LEFT TO RIGHT.

| Numeral Col. | No. | 1st Multiple Col. | No. | 2nd Multiple Col. | No. |
|---|---|---|---|---|---|
| Pay first | 1 | then | 3 | then | 9 |
| Then | 2 | then | 6 | then | 18 |
| | | | | then | 27 |
| Then | 4 | then | 12 | then | 36 |
| Then | 5 | then | 15 | then | 45 |
| | | | | then | 54 |
| Then | 7 | then | 21 | then | 63 |
| Then | 8 | then | 24 | then | 72 |
| | | | | then | 81 |
| Then | 10 | then | 30 | then | 90 |
| Then | 11 | then | 38 | then | 99 |
| | | | | then | 108 |
| Then | 13 | then | 39 | then | 117 |
| Then | 14 | then | 42 | then | 126 |
| | | | | then | 135 |
| Then | 16 | then | 48 | then | 144 |
| Then | 17 | then | 51 | then | 153 |
| | | | | then | 162 |
| Then | 19 | then | 57 | then | 171 |
| Then | 20 | then | 60 | then | 180 |
| | | | | then | 189 |
| Then | 22 | then | 66 | then | 198 |
| Then | 23 | then | 69 | then | 207 |
| | | | | then | 216 |
| Then | 25 | then | 75 | then | 225 |
| Then | 26 | then | 78 | then | 234 |
| | | | | then | 243 |
| Then | 28 | then | 84 | then | 252 |
| Then | 29 | then | 87 | then | 261 |
| | | | | then | 270 |
| Then | 31 | then | 93 | then | 279 |
| Then | 32 | then | 96 | then | 288 |
| | | | | then | 297 |
| Then | 34 | then | 102 | then | 306 |
| Then | 35 | then | 105 | then | 315 |
| | | | | then | 324 |
| Then | 37 | then | 111 | then | 333 |
| Then | 38 | then | 114 | then | 342 |
| | | | | then | 351 |
| Then | 40 | then | 120 | then | 360 |
| Then | 41 | then | 123 | then | 369 |
| | | | | then | 378 |
| Then | 43 | then | 129 | then | 387 |
| Then | 44 | then | 132 | then | 396 |
| | | | | then | 405 |
| Then | 46 | then | 138 | then | 414 |
| Then | 47 | then | 141 | then | 423 |
| | | | | then | 432 |
| Then | 49 | then | 147 | then | 441 |
| Then | 50 | then | 150 | then | 450 |
| | | | | then | 459 |
| Then | 52 | then | 156 | then | 468 |
| Then | 53 | then | 159 | then | 477 |
| | | | | then | 486 |
| Then | 55 | then | 165 | then | 495 |
| Then | 56 | then | 168 | then | 504 |
| | | | | then | 513 |

| | | | | | |
|---|---|---|---|---|---|
| Then | 58 | then | 174 | then | 522 |
| Then | 59 | then | 177 | then | 531 |
| | | | | then | 540 |
| Then | 61 | then | 183 | then | 549 |
| Then | 62 | then | 189 | then | 558 |
| | | | | then | 567 |
| Then | 64 | then | 192 | then | 576 |
| Then | 65 | then | 195 | then | 585 |
| | | | | then | 594 |
| Then | 67 | then | 201 | then | 603 |
| Then | 68 | then | 204 | then | 612 |
| | | | | then | 621 |
| Then | 70 | then | 210 | then | 630 |
| Then | 71 | then | 213 | then | 639 |
| | | | | then | 648 |
| Then | 73 | then | 219 | then | 657 |
| Then | 74 | then | 222 | then | 666 |
| | | | | then | 675 |
| Then | 76 | then | 228 | then | 684 |
| Then | 77 | then | 231 | then | 698 |
| | | | | then | 702 |
| Then | 79 | then | 237 | then | 711 |
| Then | 80 | then | 240 | then | 720 |
| | | | | then | 729 |
| Then | 82 | then | 246 | then | 738 |
| Then | 83 | then | 249 | then | 747 |
| | | | | then | 756 |
| Then | 85 | then | 255 | then | 765 |
| Then | 86 | then | 258 | then | 774 |
| | | | | then | 783 |
| Then | 88 | then | 264 | then | 792 |
| Then | 89 | then | 267 | then | 801 |
| | | | | then | 810 |
| Then | 91 | then | 273 | then | 819 |
| Then | 92 | then | 276 | then | 828 |
| | | | | then | 837 |
| Then | 94 | then | 282 | then | 846 |
| Then | 95 | then | 285 | then | 855 |
| | | | | then | 864 |
| Then | 97 | then | 291 | then | 873 |
| Then | 98 | then | 294 | then | 882 |
| | | | | then | 891 |
| Then | 100 | then | 300 | then | 900 |

AND SO ON.

A large number of these Class A certificates were issued. The assistant attorney-general of the United States for the post-office department having given an opinion that the scheme indicated in these certificates was a lottery, by an order of the postmaster-general the mails were closed against the company, and, under the usual rules of the department in such cases, all letters addressed to the company were stamped as fraudulent and returned to the writer. An appeal was made to the department to reverse this ruling, but the department adhered to the same, and the postmaster-general refused to rescind the order closing the mails to the company. There were, at the time the present case was instituted, only seventy of these certificates outstanding, and the holder of only one of them

is a party to the present proceeding. It is not necessary to determine whether the scheme indicated in this class of certificates was legal. From the evidence it appears that the officers of the company, so far as they were able to do so, protected the holders of these certificates, notwithstanding their condemnation by the post-office department, and that all the holders, except the number above referred to, have been settled with upon terms which were, so far as the present record discloses, entirely satisfactory to the holders, and that the company has in hand a fund derived entirely from receipts and investments from this class of certificates, which can and will be used, as far as practicable, in settlement with the holders of these certificates. The evidence further shows that the funds derived from this source have never been mingled with other funds of the company, nor have other funds been used in any way in the settlement or discharge of certificates of this class We will, therefore, not pass upon the legality of the scheme indicated in this class of certificates, and will eliminate from the discussion anything in reference to this class of certificates, except so far as their history may throw light upon the legality of the schemes indicated in certificates subsequently issued. The judge did not appoint a receiver on account of the illegality of these certificates. The reason he gave for the appointment was that he thought subsequently issued certificates were illegal. If the receiver had been appointed solely on account of Class A certificates, the order of appointment should and would have been limited in its operation to the fund in the treasury of the company which was set apart for the payment of these certificates. Whether there should be a receiver appointed for this fund alone has not been passed upon by the judge, and will not now be passed upon by us. Upon the refusal of the post-master-general to rescind the order closing the mails against it, the company promptly ceased to issue certificates of the class above referred to, and did all that it was possible to do under the circumstances to protect those who had in good faith bought the certificates. The company then issued certificates known as "Class B," a form of which is as follows:

"The Equitable Loan and Security Company of Atlanta, Georgia, hereby promises to pay to the order of —————— of ———— at its home office in Atlanta, Ga., FIVE HUNDRED DOLLARS, subject to the following express terms and conditions:

"1st. That the holder has paid four dollars herefor, and agrees to pay to the maker hereof at its home office, without any other or further notice, an installment of one dollar and twenty-five cents on the fifth day of each and every succeeding month hereafter, until one hundred and sixty-eight installments shall have been thus paid, time being of the essence of this contract, then this certificate shall become due and payable for its full face value.

"2nd. That the holder hereof shall surrender for payment and cancellation this certificate whenever the same shall be called, before maturity, upon the payment to him of its then redemption value, which value shall be the full amount of the first payment, and all installments paid hereon, with interest on said amount at the rate of eight per cent. per annum, and its proportionate share of all dividends or accumulations from fines, lapses, and interest earned in excess of eight per cent. per annum.

"3rd. That, in order to prevent favoritism or partiality being shown by the company, certificates paid before maturity shall be paid by numbers, and only according to the multiple table which is printed on the back hereof, which table is hereby referred to and made a part of this contract.

"4th. That of each and every installment paid as aforesaid the maker hereof shall place fifty per cent. and all net receipts from fines to a redemption fund, which may be used : (a) For paying off certificates prior to their full maturity term, according to the terms above set forth.     (b) For paying certificates in the order and manner that they shall mature at the end of the full term.     (c) For paying to the legal representatives of any deceased holder hereof the full amount of the first payment, and all installments paid hereon, with interest at the rate of eight per cent. per annum, and its proportionate share of all dividends or accumulations from fines, lapses, and interest earned in excess of eight per cent. per annum ; provided, this certificate is in good standing, and legal and sufficient notice of such death is furnished the maker hereof within sixty days after death occurs, or fines will be enforced as provided for in section 5th hereof ; and provided further, that if the holder hereof at the date of this certificate was more than fifty years of age, that the said legal representatives of such deceased shall not have the right to surrender this certificate for payment upon conditions above set forth, and the maker hereof can not be required to pay the same

under this section hereof, but will issue in lieu hereof a paid-up certificate for the amount of installments that have been paid hereon, with four per cent. per annum interest, according to the provision regulating paid-up certificates in section fifth hereof, or this certificate may be continued as though death had not occurred; and thirty per cent. to a reserve fund which shall be used and held for the protection of all live outstanding certificates; and the remaining twenty per cent. and all transfer fees shall be used for the expenses of the company.

"5th. That a failure to pay said installments when due subjects the holder hereof to a fine of fifty cents each month for each and every installment in arrears, and if any installment or fine shall remain unpaid for six months, then this certificate shall become null and void, and of no value, and the holder hereof shall and does forfeit all payments and fines made hereon.    Provided, that, at any time after eighty-four monthly installments have been paid hereon, the holder may surrender this certificate, if it is in good standing, and receive for it a new, non-assessable, and non-forfeitable certificate for the amount of installments that have been paid hereon, with interest at the rate of four per cent. per annum, which new certificate shall bear the next unsold number, and shall bear interest at the rate of four per cent. per annum, and be payable on or before the expiration of the tontine period from the time it is then issued.

"6th. That the entire assets of this company shall at all times be liable for the full payment of all obligations incurred in its certificates.

"7th. That the funds of this company may be loaned to the holders of certificates, upon terms and security to be approved and accepted by the board of directors.

"8th. That no part of the reserve or redemption funds can ever be loaned to any officer or director of this company.

"9th. That no transfer hereof shall be valid or binding on the maker until it has been approved by the directors and recorded on the books of the company at its home office, and a fee of one dollar paid for making such record.    Each and every transferee hereof accepts this certificate subject to all the stipulations herein.

"10th. That no officer or director of this company, or any member of his or their families, can purchase or own this certificate.

"11th. That no statement made by any one except as herein set forth shall be binding on this company.

" In witness whereof this company has caused this certificate to be executed in its name and behalf, under its corporate seal, by its president and secretary." (Dated and signed.)

The multiple table referred to in this certificate is the same as that which appears upon the back of certificates of Class A. The scheme of the company as indicated in these certificates was approved by the assistant attorney-general of the United States for the post-office department, and from the time it began to issue these certificates the company had the same unrestricted right to the use of the mails as any person engaged in a lawful business. Whether the certificates of Class A were legal or illegal, it is to be said to the credit of the company and its officers that they abandoned the use of the same as soon as the authorities of the post-office department had declared them to be illegal, and did not issue any other form of certificate until the same had been approved by the law officer of that department. These facts indicate that it was the intention of the officers of the company at all times to obey the law of the land and to heed the voice of its authorized officials.

Is the scheme of the company as indicated in certificates of Class B of such a character that it must be declared unlawful, violative of sound public policy, and calculated to defraud ? Let us first look at the scheme as indicated by the certificate, independently of other evidence throwing light upon the character of the contract. The certificate is an obligation on the part of the company to pay to the holder the sum of $500, subject to the terms and conditions named in the certificate. Is it reasonably probable that the scheme indicated by these certificates can be carried into execution ? While it does not appear in terms in the certificate, the fact is, as admitted, that the $4.00 paid by the certificate-holder is allowed the agent obtaining the certificate as a fee, and that this sum does not go into the treasury of the company. Twenty-five cents of each monthly installment is set apart for expenses. It is therefore to be determined whether it is reasonably probable that the company can legitimately realize with the monthly installments of $1.00, at the end of fourteen years, a sum sufficient to pay the holder of the certificate $500. Of course, if the contract is considered as simply a contract to receive $168 in monthly installments of $1.00 and to pay the holder of the certificate eight per cent. interest thereon, the contract is incapable of performance; for eight per cent. upon

$168 paid in monthly installments would not, of course, realize the sum of $500.   But that is not the contract embraced in the certificate, taken in the light of the purposes for which the company was organized.   The contract is to take the money paid to it in monthly installments and improve it according to well-known legitimate business methods, and guarantee to the certificate-holder that at the end of fourteen years the company will pay to him the sum of money named in the certificate, which the company considers by its guaranty as the legitimate earnings of the money of the certificate-holder, turned over and over and over again during the period that it is in the hands of the company.   If the company in the handling of this money were limited to investments of the money at eight per cent. simple interest annually, then no person of ordinary intelligence would for a moment purchase one of these certificates; for it would be manifest, not only to a man of average intelligence, but to the man far below the average, that such a contract was an impossibility.   The legitimate resources of the company under its charter, which may be called into exercise for the purpose of improving the funds belonging to its certificate-holders, are far more numerous than loans upon simple interest at the rate of eight per cent. per annum.   The company is authorized to loan money at eight per cent., and may contract for the interest to be payable annually, semi-annually, quarterly, bi-monthly, monthly or in even shorter periods.   Such transactions would be perfectly legitimate, and are not subject to the charge of being usurious.

But suppose it should be said that interest payable monthly or for shorter periods is unusual, and that it is improbable that the company would transact business upon this plan.   The reply is that it is legal and is one of the legitimate resources of the company, and it can not be said that it is impossible, or even improbable, that the company will realize funds from this source.   Loans of money, with interest payable at short intervals of time, are not unusual in the business world.   They are constantly made by banks and other moneyed institutions.   In addition to this, the company has a right to purchase negotiable paper, and in the purchase is not restricted, under the law of this State, to discount at the rate of eight per cent.; and the proceeds that in all probability can be derived from this source of income would aid very much in the improvement of the fund placed, under the contract, in the hands of the officers of

the company for improvement for the benefit of the certificate-holder. The company is authorized to engage in the purchase of property, either real or personal, and experience has demonstrated that wise and prudent business men make handsome profits in a business of this character. Indeed, there is scarcely any limit to the possible profits to be derived from such investments wisely made. The company is also authorized to deal in stocks, bonds, etc., and to guarantee the payment of obligations of other persons, both natural and artificial. All of these methods of business are lawful, and, if wisely adhered to, are profitable, and this company has authority to engage in them. In addition to these, there are other resources of the company for the benefit of the persistent certificate-holder who continues to the end. Under the terms of the certificate, if any member desires to discontinue payments of installments at the expiration of seven years, he may do so, taking a paid-up certificate bearing only four per cent. interest; and the legal representatives of deceased members who were more than fifty years of age at the date their certificates were issued may take paid-up certificates of similar character. Another resource is redemption of certificates. Still another is fines; and lastly lapses or forfeitures for non-payment of assessments during the first seven years. The company holds out to the world that it will take the money of others and improve it in these various ways and pay back at the end of fourteen years a guaranteed sum.

Let it be conceded for the moment that all of the sources of profit above referred to are legitimate and proper, can it be said as matter of law that the scheme of the company is so far beyond possibility or probability of performance that those who engage in it are engaged in a fraudulent scheme which should be branded as being contrary to a sound public policy? Have not legitimate financial institutions in the past taken the money of investors and improved it in such a way that the profits were far in excess of the profits intended to be realized under this contract? Are not sound financial institutions at this time engaged in lines of lawful and legitimate business where profits of this character are realized for investors who intrust their money to them? It has been said that the "power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional,

should be exercised only in cases free from doubt." Richmond *v.* Railroad Co., 26 Iowa, 202.    It will not do for courts to declare contracts void simply because they are apparently unwise or even foolish.    The authority of the *lawmaking power* to interfere with the private right of contract has its limits, and certainly the *courts* should be extremely cautious in supervising private contracts, when the lawmaking power has not declared them to be unlawful.    The possibility or the probability of one being able to perform many of the contracts known to the commerical world is dependent upon so many considerations that it is only in an extreme case that the court should hold that a given contract is of such a character that its performance is impossible or improbable and that those who entered into it must have done so with a fraudulent intent.    Of course, it is the duty of the courts to put their stamp of disapproval upon all contracts which are fraudulent, and for this reason calculated to deceive the confiding and the credulous.    But not all foolish contracts are fraudulent, and it is neither the duty nor within the power of the courts to relieve a person from a contract merely because it is in its terms unwise or even foolish.    Taking the contract evidenced by the certificate under consideration, with all of the resources of the company which can be called into operation for the purpose of improving the funds intrusted to its care, we can not say as matter of law that the contract is so unreasonable and incapable of performance as to be void because opposed to a sound public policy.    The company may be able to comply with the contract.    On the other hand, it may not.    Contracts, although not exactly of a similar nature, but involving as much risk of loss have been complied with.    On the other hand, contracts involving less risk of loss than is apparent in this one have not been complied with.    The success of the scheme of this company depends largely upon the honesty, wisdom, and business sagacity of its officers, and those who place their money in the hands of the company take the chances that are always incident to intrusting to another the handling and improvement of a sum of money.

In thus dealing with the question, we have assumed that the company had at its command all the sources of income above referred to.    It will of course be conceded that those resources which relate to the purchase and sale of property, the guaranteeing of obligations, and the loan of money at lawful rates of interest are per-

fectly legitimate and proper; and persons engaging in business of this character lay themselves subject to no penalty or criticism. It is said, though, that the company relied upon lapses, and that lapses are based upon forfeitures, and that forfeitures are abhorred, and that contracts which depend for their performance entirely upon forfeitures are contrary to law and opposed to sound public policy. Forfeitures are not favored; and where a contract is ambiguous, and is capable of being so construed as to provide for a forfeiture and so as not to so provide, the courts uniformly hold that they will so construe the contract as to avoid the forfeiture.    But the law permits a man to make a contract which will result in a forfeiture; and when it is clear from the terms of the contract that the parties have so agreed, a court of law, as well as a court of equity, will enforce the forfeiture.    The time of payment specified in a contract may be material, and by its terms a failure to pay within that time may involve an absolute forfeiture; and if it does, this forfeiture will not be relieved against even in a court of equity.    Mr. Justice Bradley, in New York Life Insurance Co. *v.* Statham, 93 U. S. 30-31, in referring to the forfeiture of an insurance policy for non-payment of premiums, says: "Forfeiture for non-payment is a necessary means of protecting themselves from embarrassment. Unless it were enforceable, the business would be thrown into utter confusion.    It is like the forfeiture of shares in mining enterprises, and all other hazardous undertakings.    There must be power to cut off unprofitable members, or the success of the whole scheme is endangered.    The insured parties are associates in a great scheme. This associated relation exists whether the company be a mutual one or not.    Each is interested in the engagements of all; for out of the coexistence of many risks arises the law of average, which underlies the whole business.    An essential feature of this scheme is the mathematical calculations referred to, on which the premiums and amounts assured are based.    And these calculations, again, are based on the assumption of average mortality, and of prompt payments and compound interest thereon.    Delinquency can not be tolerated or redeemed, except at the option of the company.    This has always been the understanding and the practice in this department of business." See also Klein *v.* Ins. Co., 104 U. S. 88.    In Union Investment Asso. *v.* Lutz, 50 Ill. App. 176, it was held: "An investment association which applies the principle of joint tenancy

to the investments by the subscribers, the survivorship depending upon default of the members, instead of death, is not prohibited by law; and neither is such an association prohibited because the theory on which profit is promised is that one half or more of the subscribers will fail to keep up their dues, and whatever money is paid in by defaulting subscribers will enure to the benefit of those who do not default.　See also 26 Am. & Eng. Enc. L. (1st ed.) 61.

The mere fact that the business or scheme depends to some extent upon forfeitures or lapses will not be sufficient to render the entire scheme invalid.　If the scheme is dependent largely upon lapses, and it is apparent that a sufficient number of lapses to effectuate it will probably not occur during the period provided for the maturity of the contract, the question would be altogether a different one.　In such a case the scheme might be illegal.　In State v. Investment Co. (Ohio), 52 L. R. A. 530, 60 N. E. 220, it was held: "Contracts of investment security, debentures, or certificates, which can not reasonably be expected to accumulate a reserve fund equal to the stipulated endowment values within the stated period, without aid from lapses or appropriation from premiums on new business, are fraudulent, contrary to public policy, and unlawful."　In the opinion Davis, J., said: "A scheme which can succeed only by lapses is manifestly a scheme which will enrich some at the expense of others who embark in the same enterprise.　It holds out the inducement that those who may be strong enough to survive will find their profit in the weakness, the misfortunes, and the discouragements which cause a larger number of their associates to fall by the way.　Moreover, since the salvation of the company depends on these lapses, it necessarily tends to encourage and produce them.　True enough, all of these certificates are non-forfeitable after 36 monthly payments, but that only signifies that a larger number must fail in the first three years, or that the whole scheme must fail; for the vice of the plan is not that some may fail, but that many must fail, in order that all continuing certificates shall mature."　See also Peltz v. Financial Union (N. J.), 19 Atl. 668; State v. New Orleans Redemption Co. (La.), 26 So. 586.　If these authorities simply hold that where it is apparent that the scheme is so dependent upon lapses that it could not succeed without them, and where the number of lapses necessary to effectuate the scheme is beyond all reason and would in all probability not occur, the

scheme would be fraudulent, we will not undertake to combat the proposition thus laid down.     If, however, the holding goes to the extent that every scheme dependent upon lapses, even many lapses, is inherently fraudulent, we can not recognize such a ruling as in the slightest degree sound.     In a case where lapses are simply a part of the scheme, and it can not be said with certainty they form even a large part of it, the court should not declare the contract invalid as being opposed to a sound public policy simply because the success of the scheme is in part dependent upon forfeitures and lapses.     If this were the law, then not only would the business of life-insurance in all of its branches be at an end, but many contracts in other lines of business would come under condemnation.     If absolute forfeitures and lapses would not make the contract invalid, then of course partial forfeitures, such as result from the voluntary retirement of a member at the expiration of seven years, would not make the contract illegal.     Nor would partial forfeiture resulting from the death of a member affect the legality of the contract.     Considering as a whole the resources the company may resort to for the purpose of carrying out the contract, it can not be said as matter of law that the contract is fraudulent, or violative of the law of the land, or contrary to a sound public policy.     It may be that the contract is unwise; it may be that it is a contract attended with risk, even great risk.     But these are all questions to be determined by the investor, and we know of no law which prohibits him from taking the risk of such a contract.

Our learned brother of the circuit bench held that the scheme was a lottery, or at least in the nature of a lottery.     There are various definitions of a lottery, some of the broadest being as follows:  "A scheme for distributing prizes by chance or lot, where a valuable consideration is given for the chance of drawing a prize; especially where such chances are allotted by sale of tickets."     Standard Dictionary.     "A scheme by which a result is reached by some action or means taken, in which result man's choice or will has no part, and which human reason, foresight, sagacity, or design can not enable him to know or determine, until the same has been accomplished."     Bouv. Law Dic.     "Where a pecuniary consideration is paid, and it is determined by lot or chance, according to some scheme held out to the public, what and how much he who pays the money is to have for it."     Anderson's Law Dic.     "Any scheme for the dis-

posal or distribution of property by chance among persons who have paid, or promised or agreed to pay, any valuable consideration for the chance of obtaining such property, or a portion of it, or for any share of or interest in such property, upon any agreement, understanding, or expectation that it is to be distributed or disposed of by lot or chance, whether called a 'lottery,' a 'raffle,' or a 'gift enterprise,' or by whatever name the same may be known." Black's Law Dic. Lotteries and similar schemes are prohibited by the law of this State. Penal Code, §§ 406-407; *Meyer* v. *State*, 112 *Ga.* 20. There are three essential ingredients in a lottery — consideration, prize, and chance. One of these ingredients is certainly present in the scheme now under review, that is, consideration. Are the other two present? If the element of prize exists at all, it is to be found in the second clause of the certificate, which is as follows: "That the holder hereof shall surrender for payment and cancellation this certificate whenever the same shall be called, before maturity, upon the payment to him of its then redemption value, which value shall be the full amount of the first payment, and all installments paid hereon, with interest on said amount at the rate of eight per cent. per annum, and its proportionate share of all dividends or accumulations from fines, lapses, and interest earned in excess of eight per cent. per annum." If this clause of the contract can be properly construed to mean that the company is compelled, or even may call for redemption any certificates before they have earned eight per cent. interest per annum on the full amount of the first payment and on all installments paid, then there is an element of prize in the contract. But can the clause of the contract be properly so construed? It provides that the holder of a certificate shall surrender it before maturity, whenever the same shall be called, upon payment to him of its then redemption value. This redemption value is then declared to be the full amount of the first payment and all installments paid on the certificate, with interest thereon at the rate of eight per cent. per annum, and its proportionate share of profits earned in excess of eight per cent. The certificate can not be called until it has a redemption value, and that redemption value is fixed at a sum not less than eight per cent.; but it may be more than eight per cent., provided a greater sum than this has been earned. Does the contract mean other than that the company may call for redemption those certificates which have earned at least eight per

cent. on the amount paid in? Is not this the real meaning of the clause? Do not the words, "earned in excess of eight per cent.," necessarily imply that there can be no call for redemption until at least eight per cent. has been earned? This seems to us a proper and reasonable construction of the contract. But suppose the clause is ambiguous. It is familiar law that if a contract is of doubtful meaning, and one construction would make it legal and another illegal, the courts are bound to adopt that construction which will not impute to the parties an intention to disobey the law. It is not to be presumed that people intend to violate the law, and the language of their undertakings must be always construed, if possible, in such a way as to make the obligation one which the law would recognize as valid.

This view of the matter is strengthened when we consider that it is the construction which the company has always placed upon this clause in the contract. The evidence in the present case shows that the officers of the company have construed this clause of the contract to mean that there was not to be any redemption until the certificate had earned at least eight per cent. on the amount paid in. The secretary of the company testified: "A certificate is not eligible for redemption until it has earned eight per cent. at least. If a man has not been in but six months, his certificate has not a redemption value until that sum has been earned, starting always with the $1.00." "No certificate was redeemed until its pro rata part of the assets of the company equaled the full amount paid to the company on account of said certificate, with interest thereon at the rate of eight per cent. for the average time." If under the contract no certificate can ever be called for redemption until it has earned at least eight per cent., then there is no element of prize in the contract. If the affairs of the company are in such condition that some of the certificates have earned at least eight per cent. upon the amount paid in, then under the contract it is a question for the company to determine whether it is to the interest of the company to retire such certificates, either in whole or in part. The holders have all agreed to surrender their certificates whenever they are tendered this amount; and whenever the company is in a position where it can tender this amount, or more, it is simply a question as to what shall be the policy of the company — to retire a portion of such certificates at their then value,

or to retain the entire fund to be used and improved for the benefit of the certificate-holders. When the company determines that it is to the interest of all concerned that a portion of the certificates shall be redeemed, then the question arises as to how many of such certificates shall be redeemed, and how shall it be determined which certificates shall be called for redemption. The holders of these certificates place their money with the company for the purpose of increase and profit, and each investor thus placing his money with the company does so upon express condition that whenever a point has been reached where his certificate has earned eight per cent. or more, the company has the right to tender him the value of his certificate and compel him to surrender the same. It might be more to the interest of all the certificate-holders to continue to the end, but by the very terms of the contract every certificate-holder has agreed with the company that it may settle with him at the value of his certificate at any time after it has earned eight per cent. This being the contract of each certificate-holder, and it being foreseen that it would not be wise in all instances to redeem every certificate that had a redemption value, some method had to be adopted by which it would be determined who should be entitled to have their certificates redeemed if redemption was desirable, or who should be compelled to surrender their certificates if redemption at that time was undesirable. The whole purpose of the company was to make money for its certificate-holders. Under the contract it may come to a settlement with some of its certificate-holders at any time when the assets of the company would authorize a settlement at a sum made up of at least the amount paid in and eight per cent. interest thereon. When it should have this settlement was left to the discretion of the company. The number who should be entitled to such settlement at any given time was also left to the discretion of the company. The manner in which the number should be selected was not left to the discretion of the company, but was to be determined by reference to what is called the multiple table, a copy of which is set forth above. When the company has determined how many certificates shall be called, a reference to this multiple table and the books of the company showing the outstanding certificates will show exactly what are the numbers of those certificates which will be then called. It can be determined as absolutely what numbers are embraced in a given call

under the multiple table as if the plan had been adopted to redeem the certificates in numerical order. Some plan had to be adopted for ascertaining what numbers should be called when it was not desired to call all certificates that had a redemption value. Any plan adopted would be purely arbitrary, and any plan adopted would have some element of chance in it, using that word in its broad sense. If the plan had been to pay certificates in their numerical order, there would have been the same element of chance as there is under the plan actually pursued, because the time at which the certificates shall be called would be governed in each instance by the order in which the applications reach the secretary and numbers are placed upon the certificates.

But let it be conceded that there is an element of chance, the scheme is not a lottery, or in the nature of a lottery, unless there is also the element of prize. We can see no element of prize in the scheme whatever. Certificates are called for redemption and matured at their own value, without reference to the redemption value of other certificates. It may be that the redemption value of a certificate will be the same as that of another certificate of another date, or it may be that its redemption value will be smaller or greater. But the holder gets no prize in the sense that term is used in lottery law. Each holder receives a return of the money which he has paid in, together with what it has earned, and can be compelled to receive this at any time that the earnings are eight per cent. or more. The company makes the contract to pay a certain amount at the end of fourteen years, if in the management of the business it sees proper to retain the money during that entire period. It reserves the right to settle with each holder before the end of that period, at any time after the earnings of the company are such that his certificate would have the redemption value fixed in the contract, and it reserves the right to determine whether at such a time it will pay him or pay another certificate-holder whose certificate is ready for redemption, by a reference to the multiple table above referred to. It must be admitted that the plan of redemption by reference to the multiple table is unique, and may even be said to be " catchy," speaking colloquially ; and was probably resorted to for the purpose of attracting attention. But it would never do for the courts to hold that unique and unusual methods make enterprises unlawful or contrary to public policy. After the

most careful investigation and anxious consideration of this matter, we are unable to see in this contract anything which partakes of the element of prize. It seems to us that the contract is one of investment, where the investor relies upon the honesty, probity, and business sagacity of those in charge of the affairs of the company, and intrusts his money to them with the expectation of receiving satisfactory and, it may be, large profits at the end of the period fixed in the contract, but at the same time expressly undertaking to withdraw his money at any time the company is in a position to offer him, as earnings on that money, the minimum amount fixed as a redemption value of his certificate, and this too at a time when other certificate-holders, whose certificates are of greater or less redemption value than his, or it may be exactly equal with his, are not compelled to retire. It is said, though, that under the operation of the multiple table a certificate might be called at a time when it had not earned the amount necessary to make the redemption value. The secretary of the company testified: "We have never reached a multiple when the certificate has not earned eight per cent. interest on the original $4.00 and the $1.25 paid in." Under the contract as we construe it, the company would not have a right to call for redemption a certificate which had not earned its minimum redemption value; and as the company, by reference to its multiple table and the list of outstanding certificates, can tell, when it fixes the number of certificates to be called, exactly what will be the numbers embraced in the call, it is not to be presumed that the company will make a call that embraces a number which could not be lawfully redeemed. The evidence just referred to shows that so far in the operations of the company no certificate has been called which was not entitled to be redeemed under the contract as we have construed it.

To make a lottery, as above stated, three ingredients must be present — consideration, chance, and prize. We find in this contract certainly the element of consideration, possibly the element of chance, but under no circumstances the element of prize. Chance alone will not make a lottery; and chance even when coupled with consideration alone will not make a lottery. When a number of persons are entitled in any event each to a given amount, though it may not be the same amount, and all can not be paid at one time the determination by lot or chance or drawing of what portion of

that number shall be paid at different times would not give to the transaction the characteristics of a lottery.  It is when the amount to be paid, or the value of the article to be delivered, is itself determined, either in whole or in part, by lot, drawing, or chance that the elements of a lottery are present.  Corporations issue bonds and reserve the right to call in for redemption a portion of the bonds before they are due.  It is not unusual in such cases for the contract to stipulate that the numbers of bonds to be called shall be determined by lot or chance.  Such a transaction as this has never been held to be a lottery, although there was the element of chance in regard to whose bonds should be called.  It is not a lottery, because there is no element of prize.  The value of the bond is not increased or diminished by the drawing.  Each bond is paid its value at the time it is called,—no more, no less; and the only question determined by lot is whether the bond of A shall be called instead of the bond of B, or the bond of one number in preference to the bond of another number.  Many schemes and devices have been held to be lotteries.  From the briefs of counsel we select the following as a portion of the many cases that might be found relating to this subject: *Meyer* v. *State*, 112 *Ga.* 20; McLaughlin *v.* Investment Co., 64 Fed. 908; Horner *v.* U. S., 147 U. S. 449; State *v.* Clark, 33 N. H. 329; Thomas *v.* People, 59 Ill. 160; In re National Indemnity Co. (Pa.), 21 Atl. 879; United States *v.* Politzer, 59 Fed. 273; Dunn *v.* People, 40 Ill. 465; Sykes *v.* Beadon, 40 L. R. Ch. Div. 170; MacDonald *v.* United States, 59 Fed. 563, 63 Fed. 427; United States *v.* Fulkerson, 74 Fed. 619; Hudelson *v.* State (Ind.), 48 Am. Rep. 171; State *v.* Moren (Minn.), 51 N. W. 618; Ballock *v.* State, 73 Md. 1: s. c. 25 Am. St. R. 559, 8 L. R. A. 671; State *v.* Mercantile Ass'n. (Kas.) 11 L. R. A. 430; State *v.* Boneil (Mich.), 10 L. R. A. 403; Reg. *v.* Harris, 10 Cox's C. C. 352; United States *v.* Zeisler, 30 Fed. 499; United States *v.* Wallis, 58 Fed. 942; State *v.* Shorts, 32 N. J. 398; Com. *v.* Thacher, 97 Mass. 583; Quatso *v.* Eggleston (Ore), 17 Cen. L. J. 332.

We do not think it would be desirable or profitable to discuss in detail the facts of these numerous cases that have been called to our attention.  Many of them are merely cases relating to general principles in reference to the law of lottery, about which there is no dispute.  Some of them relate to investment companies; but none of these are, in our judgment, either in their facts or in their

reasoning close enough to the present case to be followed by us, even if they were decisions which were binding upon us as authority. In those cases where the facts were at all similar to those of the present case, there were some facts which, in our opinion, materially distinguished the cases from that which we now have under consideration. There was a union in each case of chance, prize, and consideration, or the contract was of such a character that it was so largely dependent upon lapses as to make it fraudulent and void. If in the foregoing discussion we have been so fortunate as to have clearly set forth what we understand to be the scheme of the contract involved in the present case, we feel perfectly safe in saying that a mere casual examination of the cases cited will be all that is necessary to differentiate every one of them from the one now under review, though it is not at all incumbent upon us to show that any distinction between the cases exists. The courts have in many cases made rulings which were intended to protect the public from being imposed upon by fraudulent devices in the form of investment companies, and it is proper that the strong arm of the courts should be used in cases where the scheme is fraudulent and calculated to deceive and defraud. But no case has been called to our attention where any court of last resort has ever held a contract like the one under consideration, understood as we think it should be understood, and as the entire scheme requires it to be understood, to be unlawful or incapable of enforcement.

It is not insisted, as we understand, that there is any infirmity in that clause of the certificate which provides that the legal representatives of a deceased certificate-holder, who was not more than fifty years of age when the certificate was issued, shall be settled with by the payment of all amounts which have been paid in, with eight per cent. interest thereon, and its share of earnings in excess of that amount; and if the deceased holder was more than fifty years of age when the certificate was issued, and his legal representatives do not desire to continue the certificate as though death had not occurred, they shall be settled with by the delivery of a paid-up certificate for the amounts paid in, bearing four per cent. interest per annum. Nor was it claimed that there was any infirmity in that part of the contract which provided that one who had paid for 84 months should be entitled to a paid-up certificate for such amounts bearing four per cent. interest per annum. It

might be that under the contract the legal representative of a holder who was not more than fifty years old when the certificate was issued would receive the full amount paid in, with eight per cent. interest thereon, at a time when this amount had not earned eight per cent.; but as this payment would be due to him by the happening of the death of the certificate-holder, which is an event coming in due course of nature, this would not make the scheme any more illegal than it would make every contract of life-insurance fraudulent and void. Taking the contract as a whole, and viewing the same as it has been construed by the officers of the company, and in the light of the manner in which the affairs of the company have been administered, we find nothing in the contract that would justify us in condemning the same as illegal.

It is said, though, that the company issued literature which was calculated to impress the public and those who invested in the company with the idea that the business carried on was the business of a lottery, and that this literature was misleading and did not set forth the character of the enterprise as now contended for by the company. We will set forth some of these extracts from the literature of the company. Certain circulars of the company sent to prospective investors contained the following statements :

" The Equitable Loan and Security Co. is an established financial institution, whose governing principles are security, profit earnings, and speedy returns to the investor.

" All certificates pay their holders their equitable ratio of profits, whether called for redemption the 12th, 24th, 36th, or any month after their issuance.

" Insurance companies kill the man and pay the policy ; the Equitable Loan and Security Co. kills the policy and pays the man, thereby insuring a speedy return to living members.

" A thorough knowledge of our plan will also show that it is absolutely perfect in point of security, profit earnings, equity, and speedy returns to the investor.

" To guarantee our certificate-holders the largest profits and quickest possible returns, no officer or director of this company, or any member of his or their families, can ever own or purchase certificates, thus preventing those who are familiar with the inside workings of the company from speculating on delinquent investors and realizing any profits at the expense of prompt and persistent holders.

"Twenty certificates purchased in the Equitable Loan and Security Company, if carried to maturity, will pay you Ten Thousand Dollars, yielding a clear profit of $5,720.00.

"The chief element and most prominent feature in our plan is to call and pay certificates as rapidly as our business will permit at their value, which value shall always be the full amount of first payment and all installments paid on them, with 8% interest, and their proportionate share of all dividends, accumulations from fines, lapses (forfeitures), and interest earned in excess of 8% per annum. For the express purpose of calling certificates for payment as rapidly and as early as possible, a redemption fund has been created," etc.

These extracts from the literature of the company contain a few of the many alluring attractions which are held out to prospective certificate-holders. They embrace, we believe, those which are principally relied on in the present case to show misrepresentation and fraud in reference to the character of the company's business. It must be admitted that these declarations in the literature of the company evince a hopeful and sanguine spirit on the part of the officers of the company, and it is evidently their desire to impress the public and possible investors with this same spirit. Is what is said in this literature anything more than an effort to call attention to the character and business of the company in an attractive, enticing, and fascinating way? Are not such methods usual in the commercial world with those who have something to sell? Are they not permissible when not false or fraudulent? When these statements are read and understood, there is really nothing inconsistent with the plan of the company as we have held it to be. But suppose we are wrong in this, and that what is said amounts to misrepresentation and fraudulent misrepresentation; so far as the present case is concerned, it will avail the defendants in error nothing, for the reason that the court has not placed its order appointing a receiver on any such ground. On the contrary, it has distinctly held, that if the individual holders of certificates were induced to purchase them by the fraudulent representations of the selling agent, or of the officers of the company, it might be ground for a rescission of the contract, so far as they were concerned, but it would not necessitate the appointment of a receiver to take charge of the entire assets of the company, unless it were shown that a receiver for the entire assets was necessary for the protection of the

rights of such persons; and that if the scheme of the company is legal and its contracts valid, if any deception was practiced upon the certificate-holders it would not require the appointment of a receiver.    So far as these misrepresentations may have been made by the agents of the company, it was not bound by them, if they were at all in conflict with what was stated in the certificate, because in the face of each certificate is a distinct stipulation that no statement made by any one, except as therein set forth, shall be binding upon the company.    This language is broad enough to apply even to statements made by the officials of the company.    The contract relations between the certificate-holder and the company are absolutely controlled by the certificate, as long as it stands as evidence of the contract.

Let it be conceded that the literature of the company which was sent out and authorized by it was calculated to impress upon those who read it that contracts of a nature not provided for in the certificate were intended, and that the applicants for certificates made their applications expecting to obtain certificates of a character indicated by the literature and different from those indicated by the certificates; when they received the certificates with the statement in them above referred to, and could see by a simple reading that the certificate was different from what was contained in the literature, they would be bound by the terms of the certificate after they became acquainted with what was contained therein, or a reasonable and sufficient time elapsed for them to acquaint themselves with its contents after the certificate had come into their possession.    The certificate was the evidence of the contract.    When it was delivered to the certificate-holder, it was his duty to read it and ascertain what was the contract relation that existed between himself and the company; and if the literature of the company proposed a different contract, he could, within a reasonable time, have claimed a rescission and recovered back what he had paid, if the contract contained in the certificate was substantially and materially different from that proposed in the literature of the company. Certainly he can not come into court as a certificate-holder, and claim rights under a contract, not only not contained in the certificate, but directly antagonistic to the statements made therein, after having received and treated the certificate as evidence of the contract between himself and the company.    The plaintiffs do not ask

either a rescission or a reformation of the contract. They claim that they are holders of the certificates as issued, and as such only do they pray for relief, and the relief asked for is not of a nature which the contract contained in the certificate would authorize. It may be that they have been deceived and defrauded and wronged by the misrepresentations of agents, or even of the officers, contained in authorized literature of the company. If so, they should not come into a court of equity endeavoring to use their position as certificate-holders to enforce a contract not contained in their certificates; but their appropriate remedy was in due time to have applied for a rescission of the contract, and ask that the company be required to pay to them the sums which it and its agents had received from them as a result of the fraud which had been perpetrated upon them. Fraud on the part of the agents and officers of the company would be a sufficient ground upon which to base an application for a rescission of the contract, but fraud of the worst type would not authorize a court of equity, in the absence of a prayer for a reformation of the contract, to decree that the certificates issued, providing a contract of one character, should, on account of the misrepresentations made at the time they were issued or applied for, be declared a contract of an entirely different character.

It appears from the evidence that a large part of certificates of Class B are outstanding, and that the company has ceased to issue certificates of this class. At the time this suit was filed the company was issuing certificates known as Class C. A copy of one of such certificates is as follows:

"In consideration of the written application for this Certificate (a copy of which is on the back of this Certificate) and the statements and agreements therein contained, which are hereby made a part of this contract, the Equitable Loan and Security Company hereby promises to pay to the order of ———— of ———— at the Home Office of the Company, Five Hundred Dollars subject to the following express terms and conditions:

"1st. That the holder hereof agrees to and shall surrender this Certificate for payment and cancellation whenever the same shall be called before maturity, upon the payment to him of its then redemption value, which value shall be the full amount of all installments paid hereon, with a guaranteed profit of Eight per cent. per

annum (which profit must be earned before this certificate shall be eligible for redemption) together with its proportionate share of all profits or accumulations arising from interest, fines and lapses in excess of Eight per cent. per annum.

" 2nd.   That of each and every installment paid hereon the maker hereof shall place Fifty per cent. and all net receipts from fines to a redemption fund, which may be used : (1st.)  For paying off Certificates prior to their full maturity according to the terms herein set forth; (2nd.)  For paying Certificates in the order and manner that they shall mature at the end of the full term ; (3rd.)  For paying to the legal representatives of the deceased holder hereof the full amount of all installments paid hereon with a guaranteed profit of Eight per cent. per annum together with its proportionate share of all profits or accumulations arising from interest, fines and lapses in excess of Eight per cent. per annum, Provided, this Certificate is in good standing and legal and sufficient notice of such death is furnished and this Certificate satisfactorily released and surrendered to the maker hereof within ninety days after death occurs ; otherwise this Certificate can not be so surrendered, and all conditions will be enforced as provided for in section fifth hereof; (4th.)  For paying all licenses and taxes :  Thirty per cent. to a reserve fund which shall be used and held for the protection of all live outstanding Certificates; and the remaining twenty per cent. and all transfer fees shall be used for the expenses of the Company and such other purposes as the Directors may approve.

" 3rd.   That the holder has paid One Dollar and Fifty cents herefor and agrees to pay to the maker hereof at its Home Office, without any other or further notice, an installment of One Dollar and fifty cents on the fifth day of each and every succeeding month hereafter, until One Hundred and Sixty-eight installments shall have been thus paid, time being of the essence of this contract; then this Certificate shall become due and payable within thirty days from the date of said last payment for its full face value of Five Hundred Dollars.

" 4th.   That in order to prevent favoritism or partiality being shown by the Company, Certificates paid before maturity shall be paid by numbers ; and only according to the multiple table which is printed on the back hereof, which table is hereby referred to and made a part of this contract.

"5th. That a failure to pay said installments when due subjects the holder hereof to a fine of 15 cents per month for each month on every installment in arrears, and if any installment shall remain unpaid for six months, then this Certificate shall become null and void, and of no value, and the holder hereof shall and does forfeit all payments (including fines) made hereon ; Provided, that at any time after eighty-four monthly installments have been paid hereon, the holder hereof may surrender this Certificate, if it is in good standing, and receive for it a new, non-assessable and non-forfeitable Certificate for the full amount of installments that have been paid hereon, with interest at the rate of 4 per cent. per annum, which new Certificate shall bear the next unsold number and shall bear interest at the rate of 4 per cent. per annum and be payable on or before the expiration of the tontine period, from the time it is then issued.

"6th. That no transfer hereof shall be valid or binding on the maker hereof until it has been approved hereon by the Secretary and recorded on the books of the Company at its Home Office, and a fee of One Dollar and Fifty cents paid for making such record. Each and every transferee hereof accepts this Certificate subject to all the stipulations herein. This Company shall have a prior lien upon this Certificate for any indebtedness due said Company by the owner hereof as shown by the books of this Company.

"7th. That no statement made by any one except as herein set forth shall be binding on this Company.

"8th. That no part of the reserve or redemption funds can ever be loaned to any officer or director of this Company.

"9th. That the funds of this Company may be loaned to the holders of Certificates, and otherwise invested, upon terms and security to be approved and accepted by the Board of Directors.

"10th. That no officer or director of this Company, or any member of his or their families, can purchase or own this Certificate.

"In Witness Whereof; this Company has caused this Certificate to be executed in its name and behalf, under its corporate seal, by its President and Secretary." (Dated and signed.)

The multiple table referred to in this certificate is the same as that set out above, except that at the bottom of the table appears the following : "If at any time any multiple number next in the regular order of redemption should not have to its credit a suffi-

cient per cent. profit to permit of its redemption according to the terms of this certificate, payment may revert back to the lowest numeral and multiple numbers coming next in order, and on which the profit is sufficient to justify their redemption, and this process continued until the suspended multiple numbers shall have enough . earned profit apportioned to their credit to render them eligible for redemption, according to their terms, when they may be called."

If the contracts contained in certificates of Class B are lawful, it follows necessarily that the contracts contained in certificates of Class C would be lawful. In fact it was practically conceded that the issue in this case depended upon the validity of certificates of Class B. Upon the invalidity of these certificates the court based its order appointing a receiver, and we think it is evident that the judgment appointing a receiver of the entire assets of the company was not based upon the certificates of either class A or class C. The court based its decision appointing a receiver solely upon the ground that the scheme of the company was unlawful, and not upon the ground that the company was not carrying out in good faith the scheme authorized by the charter and indicated by the contracts made with the certificate-holders. We are constrained, for the reasons above given, to disagree with our learned brother in reference to the legality of this scheme. We have set forth what we believe to be the true interpretation of the contract. If the company is not keeping within the limits of its charter powers, or if it is not managing the assets in the manner provided in its contracts with the certificate-holders, of course they have their appropriate remedy to bring the company within the limits of its charter and the scheme as set forth in the certificates. Whether the company has exceeded its charter powers, or whether it has managed the assets of the company in any improper way, it is not incumbent upon us to determine at the present time. The finding of the judge to the contrary precludes any inquiry into the subject so far as the present case is concerned. In our opinion the judgment must be reversed on the ground that the court erred in its interpretation of the contract; and as upon this ground alone a receiver was appointed, the order appointing the receiver should be vacated and the assets of the company restored to the possession of the officers of the company, to be administered by them in accordance with the charter, the contracts, and the law of the land.

From the view we have taken of the case, it is unnecessary for us to investigate the question whether a court of equity would under any circumstances take charge of the assets of a lottery company at the instance of one who knowingly went into the unlawful scheme. On first impression, it would seem to us that the purchaser of a lottery ticket was in pari delicto with the seller; and if the scheme of the company was as the learned judge of the court below held, the holders of certificates would be in no better position than the purchasers of lottery tickets. Upon this question, however, we refrain from expressing any matured opinion. Certain it is, however,.that if the scheme of the company was in the nature of a lottery, and a court would, at the instance of one who went into the scheme, take charge of the assets of the company, then every person who ever paid one cent into the company would be entitled to participate in the distribution of these assets, even though by reason of his default his certificate had been forfeited. The assets should not be administered for the benefit alone of certificate-holders who are in. They obtain no rights under their certificates, because the contracts would be illegal. If they have any rights, they arise from the fact that they paid money into an unlawful enterprise, and the holders of certificates who have paid in and lapsed are just as much entitled to participate as those who have paid in and have not lapsed. If a court of equity will take charge of these assets, in order to prevent them from being used for this unlawful business, these assets should be returned to the true owners of the fund, that is, the holders of certificates at the present time and all persons who have contributed to the fund at any time. One reason why it appears to us that it is not the province of a court of equity to soil its hands in distributing a fund of this character is, that after all persons who have ever contributed to the fund have been repaid the amount contributed, with lawful interest thereon, and even the costs of suit and of the receivership have been paid, there will probably be remaining a surplus in the hands of the court, and it would be necessary to determine to whom this surplus belonged. A court of equity would certainly not give this fund to the holders of the lottery tickets, as it were. If it did, it would encourage people to buy lottery tickets, and would be giving to those who bought the tickets a part of the profits of the illegal enterprise. If the fund remaining in the hands of the court were not

given to the purchasers of the tickets, it would have to be divided among the operators of the illegal scheme; and it would certainly be an unusual spectacle for men who had been promoters of a lottery scheme, and who had had a fund raised by them taken from them by a court of equity, to wait around the doors of the court until the fund had been administered, to see how much a court of equity would return to them as the promoters of the scheme.  At no time in the history of the court of chancery have persons in possession of a fund procured by unlawful means been known to wait around the doors of the court for the time to arrive when a portion of such a fund should be returned to them by the court, for the reason that the owner could not be found and the court must make some disposition of it.  The doors of a court of equity are closed against such persons, and should never open to admit a fund which would have to be so administered that a time would arrive when the law-breaker, loitering at the doors of the court in anxious solicitude as to the time and terms of the final decree, must be sent for in order that the court may deliver to him a part of the fund remaining unadministered in its hands.  The unadministered part of the fund in such cases can not, consistently with any rule of law or equity, be paid to those who were enticed into the illegal scheme; and a court of equity has no right to confiscate even the property of a law-breaker; and at the end of litigation of the character indicated by the above reflections, the only course open to the court would be to call in the transgressor of the law and deliver to him a fund which, according to the rules of law and equity, could not with propriety be delivered to any one else.  However, as said above, we do not decide this question.  These are simply some reflections growing out of the possibilities that might result from an attempt by a court of equity to administer a fund which in its inception and growth is tainted and impure.  It does now seem to us that the only court that should ever open its doors to him who would improve his fortune by methods not authorized by law is that court which has jurisdiction to punish offenders against the law.  Of all courts, a court of equity should not be opened to the lawless, to settle controversies concerning their spoils.  The lawless should neither be allowed to pass the threshold of such a court, nor permitted to linger around its portals in anticipation of a benefit to be derived from its decrees.

Having reached the conclusion that the individuals engaged in this enterprise are not subject to the criticism that they are the managers of a lottery or promoters of a scheme which is unlawful, we are saved the necessity at the present time of deciding what would have been the rights of these certificate-holders if their contentions had been sound.

*Judgment reversed. Fish and Candler, JJ., concur. Lumpkin, P. J., absent. Simmons, C. J., and Lamar, J., dissent.*

LAMAR, J. I can not assent to the majority opinion, and have attempted in the headnotes to indicate, as briefly as possible, what I conceive to be the law applicable to this case, in which, I am authorized to say, Chief Justice Simmons concurs. The reporter has been requested to incorporate in the official report the learned and able opinion of his honor, Judge J. H. Lumpkin, of the Atlanta circuit, and this makes it unnecessary to go into any elaborate discussion of the authorities, or to set out at greater length the facts appearing in the record.

ON MOTION FOR REHEARING.

COBB, J. The application for a rehearing in this case is based upon numerous grounds. A rehearing is asked upon the ground that the case was heard by only five Justices and the judgment rendered was concurred in by only three. It is now asked that the case be reheard before a full bench of six Justices. These facts alone furnish no sufficient reason for a rehearing. Under the constitution and laws, three Justices may render a judgment in any case heard before less than six Justices. Even if under any circumstances a litigant has a right to ask that his case be heard before a full court of six Justices, the application must be made before the case is heard. The fact that one or more of the Justices is absent and the judgment is rendered by three Justices only constitutes no ground for a rehearing at the instance of a party. While it does not appear in the official report of the case, still the records of this court disclose that in the case of *Gilbert* v. *State,* 116 *Ga.* 819, which was heard by four Justices and the judgment rendered by three, the fourth dissenting, an application for a rehearing upon the ground above referred to was refused.

It is further contended that a rehearing should be granted for the reason in that the opinion of the majority it is recognized that the

scheme is dependent to some extent upon the doctrine of survivorship; and that as joint tenancy with its incident of survivorship has been abolished in this State, the ruling is unsound to the extent referred to.   It is true that the common-law doctrine of survivorship among joint tenants was abolished by the constitution of 1777. *Lowe* v. *Brooks*, 23 *Ga.* 325; *Carswell* v. *Schley*, 56 *Ga.* 101, 108. See also *Bryan* v. *Averett*, 21 *Ga.* 402; *Harrison* v. *Harrison*, 105 *Ga.* 520. The code declares: "Joint tenancy does not exist in this State, and all such estates, under the English law, will be held to be tenancies in common under this code." Civil Code, § 3142. It follows therefore that wherever an instrument creates an estate which at common law would be held to be a joint tenancy, in this State the instrument would be held to take effect as to all its terms, except so far as it provided by implication for survivorship among the tenants, and such tenants would be held to occupy to each other, so far as this question is concerned, the relation of tenants in common.   While the doctrine of survivorship as applied to joint tenancies has been distinctly abolished and does not exist in this State, there is no law of this State that we are aware of which prevents parties to a contract, or a testator in his will, from expressly providing that an interest in property shall be dependent upon survivorship.   Of course all presumptions are against such an intention; but where the contract or will provides, either in express terms or by necessary implication, that the doctrine of survivorship shall be recognized, we know of no reason why a provision in the contract or will dependent upon such doctrine may not become operative under the laws of this State.   While this question seems not to have been distinctly passed upon by this court, there are numerous cases in which the doctrine of survivorship has been recognized as being operative.   Among the cases on this subject, see *Riordon* v. *Holiday*, 8 *Ga.* 79 ; *Benton* v. *Patterson*, Id. 146; *Dunn* v. *Bryan*, 38 *Ga.* 154; *Hooper* v. *Howell*, 50 *Ga.* 165, s. c. 52 *Ga.* 316; *Parrott* v. *Edmondson*, 64 *Ga.* 332; *Olmstead* v. *Dunn*, 72 *Ga.* 850.   At common law an estate in joint tenancy, with the incident of survivorship, was created in any case where lands or tenements were granted to two or more persons, to be held in fee simple, fee tail, for life, for years, or at will.   The mere creation of the estate in two or more persons, without more, drew to it the incident of survivorship.   See 2 Bl. Com. 180.   In Georgia the mere creation

of the estate in two or more persons never draws to it survivorship as an incident, and the presumption is in all cases that survivorship was not intended. But where by express terms or necessary implication a survivorship is provided for, the law of Georgia allows it to exist. This exact question has been passed upon in other States having statutes abolishing the doctrine of survivorship as applied to joint tenancies. In Arnold *v.* Jack's Executors, 24 Pa. St. 57, the Supreme Court of Pennsylvania held that though survivorship as an incident to joint tenancies had been abolished in that State, it might be expressly provided for by will or deed; Knox, J., in the opinion saying: "But conceding that the right of survivorship, as an incident of a joint tenancy, no matter how created, is gone, it by no means follows that this right may not be expressly given either by a devise in a will or by grant in a deed of conveyance. It may cease to exist as an incident, and yet be legally created as a principal." See also Jones *v.* Cable, 114 Pa. St. 586; Sturm *v.* Sawyer, 2 Pa. Sup. Ct. Rep. 254; Lentz *v.* Lentz. 2 Phila. 148. In the case of Taylor *v.* Smith, 21 S. E. 202, the Supreme Court of North Carolina held that the act abolishing survivorship in estates in joint tenancy did not prohibit contracts making the rights of the parties dependent on survivorship. In the opinion Avery, J., said: "The act of 1784 (Code, § 1326) abolishes survivorship where the joint tenancy would otherwise have been created by the law, but does not operate to prohibit persons from entering into written contracts as to land, or verbal agreements as to personalty, such as to make the future rights of the parties depend upon the fact of survivorship." See also 17 Am. & Eng. Enc. L. (2d ed.) 650.

The remaining grounds of the application for a rehearing relate to matters which were fully discussed and carefully considered. Attention is called in the motion for a rehearing to the case of State *v.* Hawkins (Md.), 51 Atl. 850. Even if this case can be considered as antagonistic to the conclusion reached in the present case, we find nothing in the reasoning of the court which dissatisfies us with the conclusions we have reached. In addition to the cases cited in the original opinion on the question of what constitutes a lottery, we take this occasion to call attention to the following: Hall *v.* Cox, 1 Q. B. 198; Regina *v.* Dodds, 4 Ont. 390; Regina *v.* Jamieson, 7 Id. 149; Stoddart *v.* Argus Printing Co., 2 K. B. 474; Dunham *v.* St. Croix Mfg. Co., 34 N. Bruns. 243; United

States *v.* Rosenblum (U. S. C. Ct. So. Dist. N. Y.), N. Y. Law. Jour. March 26, 1903.

While the differences of opinion among the Justices of this court as indicated by the opinions filed still exist, so far as the merits of this controversy are concerned, we are all agreed that no sufficient reason has been given why this case should be reargued.

*Application denied.*